```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   AUDEMARS PIGUET HOLDING S.A.,
     AUDEMARS PIGUET (NORTH
 4   AMERICA) INC.,

 5                Plaintiff,

 6          v.                                    12 CV 5423 (HB)

 7   SWISS WATCH INTERNATIONAL,
     INC., d/b/a Swiss Legend,
 8   d/b/a SWI Group,

 9                Defendant.

10   ------------------------------x
                                              New York, N.Y.
11                                            May 1, 2013
                                              10:45 a.m.
12
     Before:
13
                         HON. ANDREW J. PECK,
14
                                              Magistrate Judge
15
                              APPEARANCES
16
     SPRINGUT LAW PC
17        Attorneys for Plaintiff
     BY:  MILTON SPRINGUT
18        TAL S. BENSCHAR

19   BORSTEIN & SHEINBAUM
          Attorneys for Defendant
20   BY:  JAMES B. SHEINBAUM

21   LOUIS FOGEL & ASSOCIATES
          Attorneys for Nonparty Gilt Groupe, Inc.
22   BY:  LOUIS FOGEL

23

24

25
```

1           (In open court)

2           THE COURT:  All right.  Let's deal with the discovery

3   issue first.  Normally, I might do it differently, because if

4   you settle, then the nonparty doesn't have to do anything.  But

5   since they have been sitting around for an hour or so being

6   entertained by the incompetent lawyers in the prior cases, they

7   shouldn't have to sit around any longer than necessary.

8           So let me just pull the letters you've given me on

9   this out.

10          Okay.  I guess it's your application, Mr. Springut.

11          MR. BENSCHAR:  Good morning.  Tal Benschar, your

12  Honor.

13          Our application is to enforce the subpoena to Gilt

14  Groupe.  It's a company in New York, so there's certainly

15  jurisdiction.

16          The purpose of the subpoena is twofold; there are two

17  issues that it addresses.  One is we have a claim for an

18  accounting of profits on the defendants, and a lot of this

19  information concerns how many watches -- just to back up a

20  step.

21          The defendants, as your Honor knows, sell these

22  watches; but not only do they sell it on their own website at

23  the retail level, they sell it to other platforms that sell it

24  at retail, including the defendant -- including Gilt Groupe,

25  which has a website at gilt.com.

1            I went on the site.  It seems to be a high-fashion

2   kind of site that has these sales; you have to be registered

3   with them.  And they have these periodic sales.  This is on

4   sale for two days, come and bid for this.  But you have to be a

5   member or registered with them in order to see what's going on.

6            So the defendant's records show, in addition to

7   whatever the defendants sold at their own retail site, they've

8   sold over 1600 units to Gilt Groupe, and there were some

9   returns.

10           So the purpose of the subpoena is twofold:

11           One is for an accounting of profits; we want to verify

12  how many were sold, how many were returned, how much money was

13  paid for them, etc., just so we can verify to see what's on the

14  purchase side for the defendants, Swiss Watch International

15  primarily, the primary defendant.

16           Second, it relates to what I would call channels of

17  trade.  The defendants have argued that their watches are

18  different -- notwithstanding they look similar, are different

19  from our watch because they are much, much cheaper, they are

20  sold in different channels of trade, different target audience,

21  different kind of advertising and, therefore, there's no

22  likelihood of confusion.  If you read their summary judgment

23  motion, they make a lot of these kind of arguments.  And while

24  we certainly understand and have taken discovery on what the

25  defendant's own retail platform is, the secondary platform that

1    they sell at wholesale and at Gilt Groupe and others sell, we
2    want to investigate what are they doing.  So that's what we're
3    asking:  What price was it sold, and what kind of advertising
4    they did, etc.
5             I should just note, for example, I know -- I can't
6    tell what Gilt Groupe sold it on, but I know, for example,
7    Amazon was selling it at a higher price than the defendants
8    were selling it.  So that's really the two bases of this -- the
9    subpoena.
10            THE COURT:  All right.  I'm going to ask both counsel
11   a question, and that is, have you read Judge Grimm's decision
12   in *Mancia v. Mayflower*?  Yes, it's out of this district, but
13   it's one that I fully support; indeed, I believe -- I would
14   have to relook -- that I cite to it in my individual practices.
15   So have you read it?
16            MR. BENSCHAR:  No, your Honor.
17            THE COURT:  Mr. Fogel?
18            MR. FOGEL:  I have not, your Honor, no.
19            THE COURT:  All right.  Well, then I'll ask another
20   question, which is:  Have you all read Rule 26(g) lately, which
21   is the Rule 11 equivalent for discovery.  That's what the
22   *Mancia* case is all about; it's about criticizing requests for
23   any and all documents about etc., and criticizing objections
24   that go through all the knee-jerk overbroad burden, don't
25   understand it, even if I understood it, etc., etc., etc.  I

1    think you're both guilty of that.
2             So let's try to cut to the chase quickly.
3             One objection that I'll take care of is that
4    reasonable costs of compliance should be reimbursed by the
5    plaintiff.  Any problem with that, Mr. Benschar?
6             MR. BENSCHAR:  No, your Honor.
7             THE COURT:  Good.  So that takes care of one of Gilt's
8    objections.
9             Second.  When you say "all documents," are you
10   looking, in essence, to the extent there is a computer printout
11   that shows how many they sold, how much was sold, etc., etc.,
12   that you would be happy with that?
13            MR. BENSCHAR:  That, and if there are any, like, for
14   example, purchase orders.
15            THE COURT:  Why?
16            MR. BENSCHAR:  Depends what -- there may be a
17   description there of what kind of watches they are or what
18   information is there.  They're describing the watches, a
19   certain kind of a watch.
20            THE COURT:  I'm assuming they are describing it by the
21   name or order number of the watch.  You think it's actually
22   going to say purchase order for SWI's Watch No. such-and-such,
23   which is the equivalent of Audemars' watch?  Really?
24            MR. BENSCHAR:  I don't know, Judge.  I've seen that
25   before in some cases.  I mean I doubt in this case, but...

1                THE COURT:  Mr. Fogel?

2                First, any problem with computer printouts of purchase
3    and sale information?

4                MR. FOGEL:  Your Honor, we had offered -- you know,
5    there's several defects with the subpoena.  I know you just
6    want to kind of cut to the chase on this.  So we had offered to
7    provide summary computer records to verify our purchases from
8    the defendant.  That was rejected.  Our position with respect
9    to our sales is that we didn't see how our client as a
10   nonparty, how his profits -- its profits were relevant to this
11   case.

12               THE COURT:  Defendant may, under certain aspect of the
13   law, be responsible for it, or it may not.  But relevance is
14   not a third-party objection.  There's very standard case law on
15   that.  That's one that you don't have standing to raise.

16               MR. FOGEL:  I know the defendant wants to be heard on
17   this, your Honor, maybe with respect to that issue also, I
18   believe with respect to a time frame issue, because I believe
19   the subpoena is broader than the defendant believes --

20               THE COURT:  What's the time frame?

21               MR. FOGEL:  The time frame in the subpoena is a
22   two-year period from 2010 -- I'll give you the exact --
23   anything came into existence since January 1st, 2010.

24               THE COURT:  Why is that overbroad?  That's within the
25   statute of limitations, isn't it?

1            MR. FOGEL:  May the defendant address that, your
2    Honor?
3            THE COURT:  Yeah, except you're giving me good reasons
4    to say that I'm not going to shift costs.  Since you're in bed
5    with the defendant, let them pay yours costs.
6            MR. FOGEL:  I haven't had any discussions with counsel
7    before this morning.
8            THE COURT:  I don't understand why you care.  And if
9    they care, they should have told me in advance of the
10   conference.  And, in any event, I'm not sure they have standing
11   either.
12           MR. FOGEL:  I'm just trying to cut down the burden on
13   the nonparty, your Honor.
14           THE COURT:  It's a computer.  I know I'm not one of
15   those judges who says it's the computer, press the Staples
16   "Easy" button, but are you really telling me that your sales
17   are not computerized in such a way that it's just as easy to
18   give you from January 1, 2010 as it would be from January 1,
19   2011 or '12 or anything else?  Really?
20           MR. FOGEL:  I certainly couldn't represent that to the
21   Court, no.  And if we're talking just about a computer
22   printout, which is something that counsel had not been willing
23   to accept, then that's certainly much less burdensome than
24   producing all the underlying documents.
25           THE COURT:  Mr. Springut.

1            MR. SPRINGUT:  That's not correct, Judge.  I told
2    Mr. Fogel that on the sales side, I would take the computer
3    listing which showed what each of these things were sold at.  I
4    didn't need each invoice there.
5            MR. FOGEL:  That's not correct, your Honor.
6            THE COURT:  All right.  Well, I don't know what you
7    two said to each other.
8            So here's the Court's ruling -- although I guess I
9    need to hear from -- is it Mr. Sheinbaum?
10           MR. SHEINBAUM:  Yes, your Honor.
11           THE COURT:  Do you have anything you want to say on
12   this or do you want to stay out of it?
13           MR. SHEINBAUM:  Just to point out to the Court that
14   defendant's position -- although we're not subpoenaed -- is
15   that the maximum relevant date for discovery for documents for
16   them on their alleged damage-in-profits claim is from May 3rd,
17   2012 forward, not prior to that.  And the basis for that is --
18           THE COURT:  Why?
19           MR. SHEINBAUM:  -- 15 U.S.C., Section 1111, which says
20   that if we don't have actual notice, that we have motion for
21   summary judgment on that pending before Judge Baer.
22           THE COURT:  Assuming you lose the summary judgment
23   motion, because I'm ruling on this discovery now, and the
24   summary judgment motion is not yet fully briefed --
25           MR. SHEINBAUM:  It's briefed; it's already in Judge

1   Baer's chambers.
2            THE COURT:  Right.  But there isn't a ruling yet.
3            MR. SHEINBAUM:  I agree with that.  I just want to
4   point out to the Court that --
5            THE COURT:  Okay.  Fine.
6            MR. SHEINBAUM:  -- if that may --
7            THE COURT:  Okay.  Computerized records, do you have
8   them by watch style number for the Swiss international watches?
9            MR. FOGEL:  I don't know if we have them by style
10  number, but I assume that we can produce something that --
11           THE COURT:  In other words, I don't want something
12  that in bulk says, you know, every watch we got from SWI we
13  sold -- you know, we bought 100 in 2010, and we sold 98.  That
14  doesn't help.  If you can't do it by style number, some way to
15  break it down, then the computer may not be sufficient.
16           MR. FOGEL:  I do believe -- your Honor, I have to
17  verify with the client, but I do believe that there is a way to
18  provide summary computer information related to the styles in
19  dispute.
20           THE COURT:  Good.
21           MR. FOGEL:  I'm sorry.
22           What I would ask is two things:  The subpoena seeks
23  documents and a deposition.  And my client, you know, purchased
24  such a small amount of these, your Honor, relative to what I
25  understand --

1               THE COURT:  Let's deal with the documents first.
2               MR. FOGEL:  Okay.  So with regard to the documents, I
3     would just like to make sure that it's done pursuant to a
4     confidentiality order regarding my client's selling price.
5               THE COURT:  Any problem with that?
6               MR. FOGEL:  And profits.  And profits.
7               THE COURT:  All right.  Mr. Springut says there's no
8     problem with that.
9               MR. BENSCHAR:  In fact, there is an order in place,
10    your Honor.  So if they want to designate whatever they like,
11    they can.
12              THE COURT:  All right.  So computerized records since
13    January 1, 2010 of the purchase and sale price of the watches
14    broken down by model number on a -- is annual sufficient or
15    quarterly?  What's your pleasure, Mr. Benschar or Mr. Springut,
16    since you're playing tag team?
17              MR. FOGEL:  I don't know in what increments it's
18    available, your Honor, so I'd have to --
19              THE COURT:  Assuming it's available in any increment,
20    I want to find out what is the smallest increment that is
21    acceptable -- or the largest increment, rather, that is
22    acceptable.
23              MR. FOGEL:  It would seem just the total is what would
24    be relevant.
25              MR. BENSCHAR:  I think annual would be fine.

1           But in addition, what we would like to know is what
2    each one was sold for, which leads me to the other part of it
3    is the advertising.  They may have --
4           THE COURT:  All right.  Stop.  One thing at a time.
5           MR. BENSCHAR:  Okay.
6           THE COURT:  Purchase and sale records.  And when you
7    say "each one," I am not going to have the computer, if they
8    sold ten of Model 221 watch -- and I'm making up numbers -- you
9    know, I don't care whether one of them sold for 100, and
10   another sold for 90, and one other one sold for 110, they are
11   going to give you the computer for the appropriate period for
12   the total of that model.
13          Is there any reason that doesn't work for you?
14          MR. SPRINGUT:  The whole point, Judge, is to figure
15   out what they were selling these for on the sales side.
16          THE COURT:  Yeah.  What's the difference on the
17   average?  Worse comes to worse, you know, that hides that they
18   sold, you know, 49 of them at 50 bucks each, and one of them at
19   1,000 bucks and, therefore, the average became whatever that
20   would mathematically work out to.
21          MR. SPRINGUT:  Or, for example, they didn't sell at X
22   price, and then they dumped them all at a very low price.  What
23   was the original price that they offered these is what we
24   really want to know.
25          THE COURT:  But we're talking a sale, not offer.

1          MR. SPRINGUT:  Offered for sale.

2          THE COURT:  No.  We're talking about what did they

3    sell it for, okay?

4          All right.  Quarterly -- actually, annually, with the

5    exception that since the defendant is arguing that -- what was

6    the date?  May 1, 2012?

7          MR. SHEINBAUM:  May 3.

8          THE COURT:  May 3, 2012, for 2012 split it as pre --

9    January 1 through May 2, and May 3 to the end of the year, or

10   close enough to that if the computer can't get that close,

11   break it off at April 30 or, you know, whatever.

12         MR. FOGEL:  To the extent we can nail it down by date,

13   I'll separate it before and after that cutoff date.

14         THE COURT:  All right.  And if you can't, then you may

15   have to come back to the Court.  And when you do, bring someone

16   from the client who can actually tell us, if we have to go

17   through this again, what can be done and what can't be done.

18         As to the offers for sale and advertisements, what

19   sort of documents do you have on that?

20         MR. FOGEL:  Your Honor, I don't believe that there's

21   any documents that exist.

22         THE COURT:  Then why did you object?

23         MR. FOGEL:  Well --

24         THE COURT:  Never mind.

25         MR. FOGEL:  No, no.

1              THE COURT:  Time is short.  Never mind.

2              MR. FOGEL:  Let me give you a full answer.

3              THE COURT:  Okay.

4              MR. FOGEL:  I don't believe there's any hard

5     documents.  I believe that they would have been advertising

6     this item, I believe, on their website prior to getting notice.

7     And back in November, the advertisements were taken off, and

8     plaintiffs' counsel has been informed of that, and has also

9     been informed that my client has no inventory.  And he also

10    knows that it's a small quantity in total, you know, relative

11    to the total size of the case.

12             THE COURT:  All right.

13             MR. BENSCHAR:  Your Honor, if they still have a record

14    of their website page or pages that show this item, that

15    probably show the individual -- the price, the unit price --

16             THE COURT:  What's the difference if it didn't sell at

17    that price?

18             MR. FOGEL:  Right.

19             THE COURT:  If it were easily -- look, go to the way

20    back machine, do it on your nickel, and whatever that pulls up

21    for you, it pulls up.

22             MR. BENSCHAR:  But the problem is you have to be --

23             THE COURT:  No.  Thank you.  That's it.

24             The subpoena is quashed as to that otherwise.

25             Agreements with Swiss Watch International, are there

1   any?

2              MR. FOGEL:  Yes, your Honor.  I understand there is a

3   vendor agreement that does not pertain to these particular

4   goods at all.

5              THE COURT:  It's a general one?

6              MR. FOGEL:  Yes.

7              THE COURT:  Produce it.  You have a confidentiality

8   order.

9              Now, with that material produced, and assuming that

10  there is a general agreement among the parties and Gilt as to

11  the authenticity of the material, do you need a deposition?

12             MR. BENSCHAR:  I think after we see the documents,

13  your Honor, we'll be able to determine that.  For authenticity,

14  we're not going to need a deposition.

15             THE COURT:  I fail to see, particularly since

16  essentially discovery is over, what the point is at this point.

17  So I am assuming there will be a stipulation as to the

18  authenticity of the information by all parties that if there

19  isn't, and there has to be a deposition to do that, defendant

20  can pay for it.  But I'm assuming that won't be necessary, and

21  I'm assuming there will not be a deposition of Gilt if when you

22  see the material you have super-duper good cause, you'll

23  promptly notify me.

24             MR. SHEINBAUM:  Your Honor, I just want to note for

25  the record that the defendants are reserving their rights to

1    object to the material on relevance, admissibility, etc.
2              THE COURT:  Absolutely.  That's standard for all
3    discovery.
4              MR. SHEINBAUM:  Just want to make it clear.
5              THE COURT:  Okay.  Are we done with Gilt?
6              MR. BENSCHAR:  Yes, your Honor.
7              THE COURT:  All right.  I will let plaintiff pay for
8    the transcript on an expedited basis, and send it to Gilt's
9    counsel.  And with that, Mr. Fogel, unless you have anything
10   else, you're free to sit and observe or you're free to escape,
11   as you wish.
12             MR. FOGEL:  Thank you very much, your Honor.
13             THE COURT:  Okay.  So now we're going to be off the
14   record and doing settlement.
15             Oh, we're not, as the case may be.
16             Yes.
17             MR. BENSCHAR:  Your Honor, did you receive our letter,
18   I believe it was Monday, about the expert issue?
19             THE COURT:  No.  Or if I did, it's in the midst of too
20   many other documents.  Oh, is this the one where it was mailed
21   on one date and received like three weeks later, or am I -- no.
22   Okay.  No, I have not received your letter.  If you have a copy
23   of it, why don't you hand it to me.
24             Survey issue.  I did see this somewhere.
25             All right.  Why do you need the names of the people

1    surveyed, which is highly unusual?

2             MR. SHEINBAUM:  I want to see the original

3    questionnaires in complete form.  We have an order of

4    confident -- may I finish?

5             THE COURT:  Yeah.

6             MR. SHEINBAUM:  We have a confidentiality order.  And

7    they can mark that attorneys' eyes only.  But we're in a world

8    where we experience things such as robo-signing, where people

9    have sworn and given affidavits to courts, and it turns out

10   later we find out it's not true.

11            I'm just telling you I have a right to see that they

12   don't have 100 people named Mary Smith that all were supposedly

13   residing in some county in Texas, and then it turns out there's

14   not a Mary Smith in the telephone book.

15            THE COURT:  All right.  That means you're going to

16   be --

17            MR. SHEINBAUM:  I'm not going to call them up; that's

18   not the purpose.  The purpose is to verify and see if they are

19   real.

20            THE COURT:  How do you see if they are real?

21            MR. SHEINBAUM:  The way the survey was done is the

22   person that's testifying, the expert, has no idea if it was

23   actually done in fact.  That person stayed home in Florida,

24   hired a company, and then the company gives him information

25   later.  He cannot tell whether or not anybody actually did it.

1           So one way to check, without spending a lot of money
2   trying to track down everybody that did the interviewing, is to
3   see the actual original questionnaire under an attorneys' eyes
4   only.  We have a confidentiality stipulation; I don't see the
5   problem with that.  And I won't take notes --
6           THE COURT:  Is the only purpose to see that they are
7   not all signed Mickey Mouse or they are not all signed -- or
8   many signed by allegedly the same person, or if there is a
9   unique name that, therefore, may or may not be a real person,
10  you are then going to do something on the Internet to see if
11  such a person exists?
12          MR. SHEINBAUM:  No, I'm going to bring it to the
13  Court's attention, and then ask for whether or not those
14  questionnaires can be admitted or not.  And then maybe they'll
15  be excluded, maybe they'll affect the validity of the survey.
16          I don't want to go and bother those people.  I'm
17  allowed to attack the survey and ask the person that did the
18  survey questions about the validity.  We have a deposition on
19  May 8th coming up of that expert.  I'd like to know in advance
20  so that I can prepare for that deposition.  I don't see on an
21  attorneys' eyes only basis, since we have a stipulation, why
22  that's unreasonable.  I'm not going to take notes or anything.
23          THE COURT:  Mr. Benschar?
24          MR. BENSCHAR:  Well, you know, it's interesting he
25  mentioned -- that Mr. Sheinbaum mentions that.  Just yesterday

1    we had an attorneys' eyes only deposition of our witnesses that
2    Mr. Sheinbaum's office filed on ECF, in violation of Judge
3    Baer's order.  This happened yesterday afternoon.  And we're
4    going to have --
5             THE COURT:  Okay.  Now let's deal with this:
6             No notes, no piece of paper, no pencil, no crayon, in
7    your office or in the expert's office, depending on where the
8    questionnaires are.
9             Any problem with that?
10            And on a strict, absolutely no uses to be made of the
11   information other than bringing it to either my or Judge Baer's
12   attention.
13            MR. SHEINBAUM:  One other thing.  That at the
14   deposition of May 8th, if I have questions about the survey
15   based -- that derivatively I can ask the --
16            THE COURT:  As long as it doesn't go to the identity
17   of any of the people.
18            MR. SHEINBAUM:  I won't use their names, but I'll --
19   just to verify how it was done and methodology, etc.
20            THE COURT:  From what you've said, he's not going to
21   know.
22            MR. SHEINBAUM:  We'll see.
23            THE COURT:  Okay.  Any problem with that?
24            MR. BENSCHAR:  As long as he's not taking any notes,
25   there's a court order that he may not, absent further direction

1   of the Court.  As your Honor indicated, he can't contact these
2   people, can't do anything, and then come back to the Court and
3   ask for some relief.
4           THE COURT:  All right.  So ordered.
5           MR. SHEINBAUM:  Thank you, your Honor.
6           THE COURT:  All right.
7           Can we relieve the court reporter at this time and get
8   into something that I hope will moot all of this discussion?
9           MR. SPRINGUT:  Yes, your Honor.
10          MR. SHEINBAUM:  Yes, your Honor.
11          THE COURT:  And clients should move up and sit next to
12  their attorney.
13          And you all are ordered to buy the transcript; usual
14  drill.
15                          *   *   *