```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
 3
     AUDEMARS PIGUET HOLDING SA, et
 4   al.,

 5                  Plaintiffs,          New York, N.Y.

 6          v.                           12 Civ. 5423 (HB)

 7   SWISS WATCH INTERNATIONAL,
     INC., et al.,
 8
                    Defendants.
 9
     ------------------------------x
10
                                         June 26, 2013
11                                       10:30 a.m.

12   Before:

13                  HON. HAROLD BAER, JR.,

14                                       District Judge

15                       APPEARANCES

16   SPRINGUT LAW, P.C.
          Attorneys for Plaintiffs
17   BY:  MILTON SPRINGUT
          TAL S. BENSCHAR
18
     BORSTEIN & SHEINBAUM
19        Attorneys for Defendants
     BY:  JAMES B. SHEINBAUM
20        AVRAM S. TURKEL

21

22

23

24

25
```

1           (Trial resumed)

2           THE COURT:  Well, I'm sorry you had to endure the Fire

3    Department here as well but if, in fact, you are ready to give

4    me all of your pearls I am ready to listen and absorb or I'll

5    try.

6           Why don't the defendants start.

7           MR. SHEINBAUM:  Good morning, your Honor.

8           THE COURT:  Good morning.

9           MR. SHEINBAUM:  When I was asked to give an opening I

10   referred the Court to what the issue was in the case.  And as

11   framed by the second amend complaint which repeated, what was

12   in the first amended complaint, that's docket number 27 and

13   paragraph 25, the plaintiffs have framed this case as one for

14   post sale confusion, so there's no issue of actual confusion at

15   one of their stores or one of their retailers which is called

16   point of sale.  There's no question that based on the evidence

17   before the Court that there's no evidence of a loss of direct

18   sale because of the two watches that they say are in issue.

19           So what they have now is a very rare case, as I told

20   you at the outset, of post sale confusion.  But they even made

21   it more limited because their pleading phrases as post -- what

22   they say their concern is and what they're asking you to

23   address and redress is post sale confusion in passing.  That's

24   the critical thing, the post sale confusion passing.  When you

25   look at paragraph 25 of their complaint and docket number 27

1    second amended complaint, you will see what they're talking

2    about.  So they didn't produce any evidence of post sale

3    confusion in passing.

4         For example, they tried to tell you about Dr.

5    Lirtzman.  But Dr. Lirtzman admit and his study says he didn't

6    study anybody in passing.  He studied someone who was staring

7    at the watch, our watch, the defendant's watch, one of their

8    watches or a male and a female watch or mens and ladies as they

9    call them, staring at it for ten seconds.  That's not what

10   their pleading or this case is about.  They said what their

11   concern was that someone might, may, possibly, could confuse

12   but that's not the standard.  The standard for likelihood of

13   confusion is very clear.  It's got to be more than a mere

14   possibility as this Court's well aware from the ^play text case

15   which was affirmed by the Second Circuit that it's got to be

16   more than a mere possibility, more than a hypothetical, more

17   than speculation.  It's got to be a probability.  There is no

18   proof that I heard that comes to close a probability of the

19   concern that they asked this Court to address, not the concern

20   that they danced around or they hinted at or whatever.

21        The actual concern what they say we're to try, what

22   they said the defendants theoretically knew when they designed

23   their watch because according to them we, the defendants, would

24   have known somehow hypothetically of a post sale confusion and

25   that somebody possibly who bought our watch could do something

1    that would cause somebody to be confused about an Audemars

2    Piguet watch.

3              So, let's look at what they actually had to prove

4    because they didn't make the mere shadow of an attempt to

5    prove.  They admit that the person has to be knowledgeable

6    about watches, in particular about their watch, their bezel

7    with screws.  They didn't present that person to say they were

8    confused.

9              They then say it has to be further that they have to

10   be in a situation where the person who has that specialized

11   knowledge sees the Trimix, either the mens or womens, they

12   concentrate on the mens, and is confused.  So now you have to

13   kind find a second person who is wearing it in the presence of

14   a person who either has an Audemars watch or knows of it

15   sufficiently to have a possibility of confusion.  But what they

16   said about their customer base in multiple both through

17   Mr. Nolot and through Tim Sayler back in Switzerland in his

18   publicity campaign for Let's Break the Rules, is that they have

19   a sophisticated customer.

20             And what do they show in their current campaign as we

21   were trying to show the Court?  It's Break the Rules and the

22   emphasis is not soley on the bezel.  The emphasis is not solely

23   on the Royal Oak.  The emphasis is on many collections as their

24   two books in evidence, their 2011 book and their 2012 book

25   clearly show, there are many other collections as Mr. Burgener

testified that there were many other collections that do not

bear the Royal Oak, we'll call trade dress for lack of a better

world and I'll get to that shortly.

    So, then you say to yourself, well, they must have

been promoting that a lot in New York and around the world.

And I put in evidence through all of those magazines designed

to show that consistently through interviews, through extensive

publications, there are other lines for which they're known and

for which they sell.  And to put an exclamation point to just

how little the emphasis is on this product line at the current

time in the United States, we put in three magazines for June

of this year.  One was Watch Time which they say they

advertised in and their sophisticated customers read.  And in

that one what watch are they advertising?

    That's in the composite exhibit, your Honor, that we

put in yesterday.

    They advertise not the Royal Oak.  I am not saying

they've never talked about the Royal Oak but the one that

they're emphasizing is, specifically, to their boutique in

^balance harbor and their boutique in -- excuse me -- 57th

Street.  They say they're advertising the Jewels Audemars

watch, not the Royal Oak.

    In the wallpaper magazine which is both here and

internationally, same thing, June, not the Royal Oak, a

different watch, a different collection.  And in the

1    International Watch magazine that's before your Honor, in that

2    composite exhibit June of this year what watch are they

3    advertising?  The Jewels Audemars Piguet.

4            THE COURT:  I am a little concerned about the role you

5    seem to be assessing to emphasis.  Are you suggesting that they

6    can't make their case unless they emphasize Royal Oak in their

7    advertising?

8            MR. SHEINBAUM:  No.  What I am trying to show is the

9    lack of people, that the only thing that people associate Royal

10   Oak with is not the bezel.  They associate it with

11   complications, very expensive watches.  There are other lines.

12   And as we showed through Mr. Burgener, that over 80 percent of

13   their sales and Mr. Nolot, over 80 percent of their sales are

14   outside of America to people who are not American that are not

15   here.  So my point is the now when you go through the syllogism

16   of who could possibly be confused it gets even smaller as to

17   the potential population.

18           THE COURT:  And that depends on the kind of

19   advertising?

20           MR. SHEINBAUM:  No, I am giving that -- who they

21   market to.

22           THE COURT:  I'm just trying to follow you.

23           MR. SHEINBAUM:  OK.  Fair question.  Let's see if I

24   could clarify that.

25           So, who they marketed to indicates where they think

their strength lies and who they want to attract.  So they're

not emphasizing at this point in time and in recent

advertisements, only the Royal Oak.  That's not to say that

they don't talk about the Royal Oak.  I am not saying that.

What I am trying to explain is how small the universe is to

make this potential hypothetical case exist.  And what they're

saying is you have, as they call it, collocation of elements.

You have to have a person that knows their watch.  So now you

can see reasonably maybe the person that knows Audemars Piguet

who they think they're marketing to doesn't know them from

Royal Oak.  They may know them for other watches.  So that

shrinks the universe.  Then if you get past that person you

have to have a person that bought the Trimix, OK.

          So you could have both of those two people, a person

that knows Royal Oak and a person that bought the Trimix.  But

have you to go a step further for this post sale confusion case

that's in passing, an observer in passing.  You have to have an

observer and he has to see in passing and he has to see it long

enough and clearly enough to make some kind of connection to

then do something.  They haven't presented that person.

Mr. Nolot sat here and told that you he goes out often to

restaurants in Brooklyn and other places and he hadn't seen a

Trimix.  Mr. Lirtzman told you he'd never seen a Trimix before

this case.  The declarations we put in are people who wore

Trimixes uncrossed, unchallenged that said that when they wore

1    it nobody indicated that they had seen -- that they thought it

2    was in any way related to an Audemars Piguet watch or Audemars

3    Royal Oak.

4             So their case that they posit that's framed by the

5    pleads that they're stuck with, not the case they are going to

6    talk about in their summation which is not the case before your

7    Honor which was not the case that they had been talking about

8    in all their papers, they've been staying away from, what they

9    try to do is focus you on some of the mechanical applications

10   of the elements and is pretty clear from all of the decisions,

11   a mechanical application of all of these elements is not

12   required while the various elements which have been gone over

13   at length in the summary judgment papers, in the motions in

14   limine, so I won't repeat the litany and go through it, they

15   try to focus on each one.  Many are irrelevant to this case.

16   But the fundamental you are purpose of trademark law is to

17   prevent the likelihood of confusion of an appreciable number of

18   people and it has to be more than a possibility, more than a

19   hypothetical, more than speculative.  It has to be probable.

20            Now they also have a burden of proof by the

21   preponderance of evidence.  They still always bear the burden

22   of persuasion and proving their case at the end of the day

23   despite whatever the prima facie presumptions are.  If there's

24   any evidence to make the presumption dissolve.  For example,

25   Federal Rule of Evidence 301 deals with that.  There's a case

```
1    recently that talked about it in the Second Circuit about

2    dissolving presumptions and it's the -- I am not sure if I can

3    pronounce it correctly -- ITC v. Punchgini and it's 456 F.3d

4    and I'll give you the whole cite in a minute but that was a

5    Second Circuit 2007 case but, clearly, those presumptions to

6    the extent that they are going to argue them exists, have been

7    more than met and exceeded.  But even so they still didn't

8    focus on -- just like Dr. Lirtzman, did not focus on the issue

9    that they framed.  So, they want to you believe that when Lior

10   Ben-Shmuel designed his watch somehow he knew from his customer

11   which is clearly markedly different that he knew that somehow

12   his watch would cause post sale confusion where somebody would

13   see an Audemars Piguet watch.

14            THE COURT:  You have to know that?

15            MR. SHEINBAUM:  How could you have intent?

16            THE COURT:  He didn't have to really know that when he

17   designed it that it has anything to do with the AP watches.

18   All he had to do was design it and find out that it did.

19            MR. SHEINBAUM:  But the watches don't lookalike and

20   they are not saying that they look a like.  Even in their

21   complaint they are not saying they look a like and they are not

22   saying that anybody confused it directly.  What they are saying

23   is, if you saw it in passing that you may, possibly, could with

24   all these things that have to happen and then they don't tell

25   you how many people because like Mr. Nolot said right in front
```

```
 1    of you, what proof do you have of that?  And his answers remain
 2    the same.  No proof.  No proof of that.
 3              So that's what their case is about.  But now I want to
 4    bring up two points that may not have been clear that we wanted
 5    to raise with the Court.  And one is lack of standing of AP, of
 6    Audemars Piguet North America inc. one of the plaintiffs in
 7    this case.
 8              In order to have standing under the trademark law you
 9    to be a registrant.  That's 15 U.S.C. Section 114.  And it's
10    very clear from the trademark registration before the Court and
11    the testimony that AP North American is not a registrant.
12    They're not a licensee.  They're not an exclusive distributor.
13    What they are is they are appointed, as we pointed out in
14    Defendant's Exhibit 50 as to the relationship of the various
15    parties and as Mr. Burgener explained that the relationship is
16    that Audemars Piguet Marking SA in Switzerland is the one that
17    has the exclusive rights and they determine who will be the
18    distributor in the various territories.  And they call that the
19    authorized distributor.  And then the authorized distributor
20    can operate in the territory, in this case the United States.
21              And so they're clearly out.  You've in our motion in
22    limine.  We've cited cases.  Again, that's Punchgini or let me
23    see if I can pronounce it right.  That case goes into the --
24    and the elements that in our motion in limine we talked about
25    standing in our reply.  We gave a whole section.  They brought
```

1    up standing.  We gave citations to numerous cases.  We don't

2    need to repeat those.  I would prefer the Court to see it.  I

3    think all of their claims have been to be dismissed because

4    they also have to have standing as the owner of the mark under

5    New York Law to bring the New York Unfair Competition, the New

6    York Trade delusion case and the New York General Business Law

7    360.

8          So we believe that the American company in New York is

9    out on the basis of lack of standing.  And that's

10   jurisdictional and they don't qualify because in order to

11   qualify under the Trademark Law you have to be the registrant

12   and you can look at the definition of registrant under 15

13   U.S.C. Section 1127.

14         Second issue is, which may not have been clear during

15   the case and it wasn't clear during the prior briefings is we,

16   the defendants, are seeking cancellation of the mark.  But let

17   me explain a little bit more what the evidence is about that

18   and why we're seeking cancellation.  The basis for cancellation

19   is esthetic functionality.  And we're basing that on the most

20   recent case to talk about at length in the Second Circuit

21   Christian Louboutin SA v. Yves St. Laurent America Holding 696

22   F.3d 206 Second Circuit 2012.

23         And in that case they talk about the famous red shoes

24   and they talked about color.  We're not talking about color

25   here.  We're talking about is how far can trademark law go to

protect and that's what the doctrine of esthetic functionality

does.  One of the things it does is it says, OK, you can have

your trademark.  But when it goes so far as to prevent another

company from effectively competing then you have gone too far.

And we say that Royal Oak in this case and Audemars Piguet have

gone too far.

Because if you look for example and the Court properly

asked Mr. Ben-Shmuel during his testimony, if you look at, for

example, Defendant's Exhibit 17 at page I think it's 30, the

Cartier watch at page 31 of Defendant's 17, there's a big

picture of the Cartier watch.  And you will see where the

screws are and you will see the octagonal bezel.  So, let's

suppose for a second someone else wants to make a watch, they

say it's no longer being done.  But that watch closely

resembles and could be confused, according to them, meaning the

plaintiffs, with the Royal Oak watches.

Well, they didn't bring in any evidence to show that

Royal Oak, Audemars Piguet, Audemars Piguet North America,

Audemars Piguet in Switzerland ever brought a lawsuit to stop

that watch from being seen.  And that watch more than likely

was seen over the years by a number of people who were wearing

it where there were luxury situations.  And you would think

that since they got a design patent that's publicly available

in 1981 for that, Cartier, that somebody would have made a

complaint.  There would have been a lawsuit.

1            One other thing about how well-known this mark is

2      which seems to be unclear, they didn't put in any documents to,

3      specifically, show sales prior to 2006.  So for purposes of the

4      record in the United States, so for purposes of record there's

5      actually no evidence of sales of Royal Oak prior to 2006.  We

6      don't say that there were never any sales.  We don't go that

7      far.  We just say there was no evidence.  And you would think

8      that if it was so well-known at that point in time they would

9      have put in evidence.  So in 2006 you see they sold a couple

10     thousands piece of Royal Oak.  Of course in their sales

11     document, that's Plaintiff's 213, they did not, actually, say

12     "net sales" and no one actually testified to net sales.  They

13     did back off a little bit when they were to correct their

14     testimony concerning what the sales were when they had to

15     explain what happened in the PTO and why there was a difference

16     in the numbers.  But the point is they didn't show you any

17     sales prior to 2006.

18            Then how about after November 2012?  No evidence of

19     any sales was put in after November of 2012 in their Exhibit

20     213 and no one testified about it, specifically, to say what

21     the sales were after November 2013.  Yes, Mr. Nolot said what

22     the best seller was and gave a small number but he did not

23     specify that that was in 213.  And that again goes to my point

24     about showing what the current emphasis of the company is.

25            THE COURT:  I think I really have your drift.

1            MR. SHEINBAUM:  Can I make one further point?

2            THE COURT:  Sure.

3            MR. SHEINBAUM:  OK.  What we say here is they posited

4    a case that is extremely rare.  They have gone too far.  And

5    that like in the Louboutin case we're not saying they are not

6    entitled to have their watch.  We are not saying that they are

7    not entitled to have the Royal Oak.  We are just saying that

8    they've gone way too far.  They're stifling competition.  And I

9    one point I would like to bring home that makes the Trimixes

10   different than the Audemars Piguet watch is if you look

11   carefully at the watches the places where the bolts are are

12   lined up with the hour markers because it's a diver watch.

13           THE COURT:  I heard.

14           MR. SHEINBAUM:  That is not true.

15           THE COURT:  Thank you.

16           We'll take about five minutes before we hear from the

17   plaintiff.

18           Thank you.

19           (Recess)

20           (Continued on next page)

21

22

23

24

25

1          THE COURT:  We are ready when you are.

2          MR. BENSCHAR:  Good morning, your Honor.  As you know,

3     I represent Audemars Piguet and I wanted to touch on three

4     points -- liability, willfulness, and remedies.

5          Starting with liability, we have to show, one, we own

6     a valid trademark, and, two, it was infringed by the defendants

7     by using it in a way that is likely to cause confusion.

8          As to validity, we have four registrations.  They are

9     presumed valid.  It is the defendants' burden under Second

10    Circuit law to prove that they are invalid.  When we talk of

11    this kind of a mark, a product design mark or trade dress, as

12    it is sometimes called, there are two parts -- secondary

13    meaning and non-functionality.

14         As to secondary meaning, I think we have shown the

15    Royal Oak design has been consistent and extensively promoted

16    for 40 years.  There are numerous media comments we showed.  We

17    blew up a couple of them but we will give your Honor a 1006

18    summary.  They call it an icon, a classic.  Among luxury watch

19    buyers, it is a very well-recognized design.  Even those that

20    don't necessarily buy Audemars Piguet, it is something that has

21    been promoted, recognized.  It is roughly 75 percent of the

22    company's line.  Sales in both the U.S. and abroad, and after

23    40 years there is a strong recognition to this design.

24         Now, the defendants rely primarily on a bunch of

25    watches, pictures of watches they produced, of octagonal

D6QHAUD2                    Mr. Benschar - Summation

1    watches, to somehow say that it doesn't have secondary meaning.

2    Two basic problems with that.  One is many of their pictures

3    don't look like our watch.  It is octagonal.  The more basic

4    problem is because we are talking about market perception --

5    and as I said in my introduction, that is the key for a lot of

6    the issues, including secondary meaning.  There is no context

7    as to how many of these other watches were sold, where, even in

8    the U.S., at what time, in what quantity, by whom, and, for

9    example, the Cartier octagonal Santos watch, which was one of

10   their prime examples, they were not able to -- all they were

11   able to say is sometime in the early '90s it was sold.  We had

12   testimony it was discontinued.  Now, the infringement time is

13   from 2010, when they started, to 2013, today.  A watch that was

14   sold 15 and 20 years earlier, the effect on market perception I

15   submit is de minimus, particularly when we don't know how many

16   were sold.

17          So I think at least in the luxury watch consumer

18   market, those who are willing to spend that kind of money,

19   there is definitely a strong association of the design with

20   Audemars Piguet.  It is a classic.  It is an icon.  That is not

21   my words.  That is the New York Times talking.  That is

22   WatchTime Magazine talking.  That is the gentleman on the video

23   that we showed your Honor at the beginning.  That is not a

24   lawyer who is being paid talking.  That is third parties,

25   independent, saying this is a classic and an icon.

D6QHAUD2                    Mr. Benschar – Summation

1           Turning over to functionality, I haven't heard any

2    refutation at all about what is called utilitarian

3    functionality.  There is nothing about the design that makes

4    the watch work better as a watch or cheaper to manufacture or

5    anything of that kind.  What they have now argued is what is

6    called esthetic functionality.  Under the pertinent law, they

7    have to show that it would create a significant

8    non-reputation-based competitive disadvantage.  They have to

9    show by giving us these rights that puts them at a competitive

10   disadvantage.

11          Now, that clearly is not the case here because as we

12   put in evidence, the defendants' own catalog shows there are

13   hundreds of other alternate designs.  This is less than 1

14   percent of their business.  And if your Honor enjoins them from

15   using the design, they have 99 percent of their business, many

16   other watch models and designs to use, including one which is

17   an octagonal.  We saw an octagonal watch that they have, that

18   doesn't look like our watch but it is octagonal, and we are not

19   claiming that other one, I think it is called the Octo or the

20   octagon, we are not saying that infringes.  So you can have

21   another octagonal watch that does not infringe the Royal Oak

22   trademark, and therefore the notion that this puts them at some

23   competitive disadvantage, when 99 percent of their business is

24   other designs and other models, is just a specious argument.

25          Let me turn over to infringement or likelihood of

D6QHAUD2                    Mr. Benschar - Summation

1    confusion.  Mr. Sheinbaum is correct, post-sale confusion is

2    our primary argument in this case, but, however, I looked at

3    paragraph 25.  I didn't see the term passing by.  What I saw,

4    what I see here, it said:  Based on the commercial strength of

5    the mark and the similarity of the design, "there is a great

6    likelihood that at least those who observe defendants' watches

7    being worn in a post-sale context will be confused by the great

8    similarity in design into falsely believing that such watches

9    are manufactured or sponsored by plaintiffs."

10         Nothing about passing by.  There are many ways one can

11   see something in a post-sale context -- see it worn casually in

12   a restaurant, in an elevator, on the street.  Post-sale

13   confusion has been recognized in this Circuit for over 50 years

14   in many different cases.  I don't know why Mr. Sheinbaum thinks

15   it is rare.  Virtually every counterfeiting case that is out

16   there relies on post-sale confusion, as well as many other

17   non-counterfeiting cases.

18         Now, the evidence of likelihood of confusion.  The

19   number one piece of evidence is Dr. Lirtzman's survey.  He

20   showed people, yes, people who are luxury watch consumers.  We

21   are not talking about people who own or can purchase a $15,000

22   watch, and more than a third of them saw the defendants,

23   picture of defendants' watch on someone's wrist.  Nothing was

24   removed.  Not the word Swiss Legend, not their logo.  It is

25   exactly the way you would see it on someone's wrist.

D6QHAUD2                      Mr. Benschar – Summation

1          We didn't redact, as other people have done in other

2     cases and have been criticized for, we didn't redact, and more

3     than a third of the people said it is an Audemars watch, with

4     their trademark on it.  That is an indication, that is a

5     powerful indication, that there is post-sale confusion.

6          The same thing, the movie we played.  The gentleman

7     said, in essence, this is a substitute.  If you can afford the

8     $15,000 Audemars Piguet, so God bless you, go out and buy one.

9     But if you can't, this is a good substitute, and you can get it

10    for $150 and go to my website, I will tell you where to find

11    it.  So we submit this is powerful evidence of post-sale

12    confusion.

13         Let me just address two arguments that Mr. Sheinbaum

14    has made which are legally incorrect.  One, he says we haven't

15    brought in anybody who was confused.  It is black letter law

16    you don't need actual confusion.  There are numerous cases,

17    both post sale and not post sale, where nobody does that.

18    People have even gone to jail in counterfeiting cases for

19    post-sale confusion.  United States v. Hon.  And no one has

20    ever said, well, I have to bring a Rolex consumer and look at

21    the $25 knockoff that he bought in Chinatown and say, look, he

22    saw that and he was confused.  No one has ever done that.  It

23    is virtually impossible to do, and counterfeiting cases would

24    come to a grinding halt if you had to do that.  So it is

25    likelihood of confusion.

1            In fact, similarly -- I guess it is a related

2     argument -- the crossing paths, who is going to -- we are going

3     to have a situation, Mr. Sheinbaum says, where a luxury goods

4     consumer will see someone wearing the Trimix.  Again, numerous

5     cases.  Second Circuit has never required that kind of proof.

6     And in any event, likelihood of confusion -- the defendants

7     sold over 42,000 watches.  43,000 I think by April.  43,000

8     watches all over the United States on the internet.  Now, I

9     guess maybe a few are being put in someone's collection, like

10    the firefighter with his 2,000 watches, but it is a fair

11    inference the vast majority are being worn and people are

12    wearing it all over the country and people all over the country

13    that are luxury goods consumers, it is not difficult to see how

14    one person could meet up with another.  It varied in many

15    contexts.  It could be a repairman comes to someone's house; it

16    could be in a restaurant.  Many different contexts it could be

17    seen.  But you know, the notion that we have to prove that

18    there will be a crossing of the paths, so to speak, is simply

19    not legally required.  And in any case, it is shown here.

20            Let me move over to the issue of willfulness because,

21    although that is not a requirement for liability, it certainly

22    is an important factor for the remedies.

23            This is a case of willful blindness or willful

24    indifference.  The Second Circuit said that's enough for

25    enhanced remedies.  And basically, willful blindness, you

1     ignore the warning signs.  You have a red flag and you just

2     decide, I don't care, I don't want to be bothered, I am not

3     going to deal with this and we'll see what happens.  That is

4     what willful blindness is.

5          We have numerous examples of this.  Number one,

6     Mr. Ben-Shmuel testified he is the decision maker.  He was the

7     CEO until recently, and certainly not a neophyte in the watch

8     industry.  He has 20 plus years experience, familiar with

9     Audemars Piguet and no doubt with the Royal Oak watch.  And the

10    design, when it was proposed by the Hong Kong supplier, was

11    modified to look much more like the Audemars Piguet watch.

12         Second, we have a Cartier trade dress suit in 2009.

13    Again, a watch brought by the same supplier.  And after that

14    suit was settled, very minimal effort to try to make sure no

15    further infringements.

16         Then we have the Basel fair events, and, again, the

17    importance of Basel fair is not what they decided.  We are not

18    claiming res judicata or anything.  There was a lot of

19    instances of what kind of due process rights they had.  That is

20    not the point.  The point is in Basel fair they knew Audemars

21    Piguet has a registration for this trademark.  They were told

22    this is a problem.  Someone said it was a problem.  Whether

23    they agreed with it or not, they came -- in fact, they did a

24    search and found there was a U.S. patent.  In his own notes,

25    Mr. Ben-Shmuel's notes.  So he knew there was some kind of U.S.

D6QHAUD2                          Mr. Benschar - Summation

1    right.  He made a comment, you'd never get rights like this in

2    the U.S.

3             So clearly it was on his mind there might be rights in

4    the U.S., because they are a U.S. company, and what did they

5    do?  They came home after Basel and did nothing.  No search.

6    Didn't hire an attorney to do a search.  We live in the digital

7    age where you can go on the PTO website and it would take me

8    about five minutes to find Audemars Piguet registrations, and

9    we had two at the time.  We already had two.  Two were issued

10   during the pendency of the case.  And no effort to hire an

11   attorney, to ask counsel to help, to do anything other than we

12   just decided we don't care and this is what it is.

13            Then we have the cease-and-desist letter in May 2012.

14   Just ignored it.  Continued selling again and again on their

15   website and to others.  Then after suit started again continued

16   sales.

17            The defendants say, well, we had these outstanding

18   orders.  Quite frankly, I don't think that is particularly

19   credible because this is their, one of their largest suppliers.

20   Millions of dollars of business.  It is hard to believe that

21   they can't -- the suit was in July and they are still getting

22   orders in March of 2013, the record shows, the document shows,

23   and that they couldn't figure out how to cancel the orders or

24   modify it to be non-infringing or do some other model of their

25   hundreds of other models.  It stretches credibility.

D6QHAUD2                      Mr. Benschar - Summation

 1           And, finally, Mr. Ben-Shmuel's summary judgment
 2   declaration, paragraph 30, where he says to the court:  We've
 3   never been sued.  Defendants have never been sued for trade
 4   dress infringement.  His words.  Not our words.  Well, in fact,
 5   they were sued for trade dress infringement in 2009 by Cartier.
 6   And yours truly and Mr. Springut were the initial lawyers
 7   there.  So we know it very well.
 8           Again, that is an attempt to mislead the court.  It is
 9   not true.  As the Supreme Court said, when you are dishonest
10   about a material fact, the court can draw an adverse inference
11   against you.
12           THE COURT:  It is not a willful indifference problem.
13   It is a separate concern.  Go ahead.
14           MR. BENSCHAR:  Well, your Honor, the reason it is
15   relevant is because in that declaration I think Mr. Ben-Shmuel
16   was trying to convince the court of his good faith, and one way
17   he said is we've never been sued this way before.  So he is
18   trying to convince the court of his good faith and meanwhile,
19   he is misrepresenting a fact that goes to his good faith.  So
20   that is why I think it is relevant.
21           Now let me go over to the issue of remedies.
22   Obviously we are going to ask for an injunction.  That is
23   pretty standard in a trademark case.  I think we have met the
24   four eBay factors -- confusion, causes irreparable harm.  It is
25   very difficult to show damage.  We are being damaged, but it is

D6QHAUD2                        Mr. Benschar - Summation

1    hard to show.  As in almost every trademark case, it is very

2    hard to go out to say how your sales are affected.  And in any

3    event, as a number of courts have said, losing control of your

4    reputation, that alone is irreparable harm.  Even if they had

5    perfectly good watches that were perfectly the same as ours,

6    the fact that someone has something confusing with ours, today

7    may be a perfectly fine watch, tomorrow it may be a junky watch

8    and lose control of a company's reputation, that alone is

9    irreparable harm.

10           The balance of the harms, clearly, as the defendants,

11   Mr. Ben-Shmuel testified, is less than 1 percent of his

12   business.  The business can go on quite nicely with or without

13   an injunction.  So that's what we would be asking the court.

14           Let me go to the issue of profits.

15           THE COURT:  You keep harping on that aspect, but if

16   you haven't proven your case, what is the difference whether it

17   is 1 percent or 50 percent?

18           MR. BENSCHAR:  No, I understand.  We have to show

19   liability clearly.  But under eBay, one of the factors is

20   balance of the harms.  I'm asking the court for an injunction.

21   One of the eBay factors is to show the balance of the harms

22   between the plaintiff and the defendant.

23           THE COURT:  Once you prove your case.  Once liability

24   is proved.

25           MR. BENSCHAR:  I understand, but I am addressing

1   everything, though.

2              THE COURT:  We are on to remedies.

3              MR. BENSCHAR:  Right.

4              The big issue here is the defendants' profits.  The

5   issue of the notice and the notice of the registration we have

6   briefed extensively.  I won't repeat that now.

7              The total sales, the defendants' CFO admitted, were

8   about $4.3 million.  The statute requires -- it is the

9   defendants' burden to prove, not our burden.  We have to show

10  sales of infringing items.  They have to show cost.  It is

11  their burden.

12             They have two kinds of cost -- direct cost.  No back

13  up documents in evidence.  Many of their costs were admitted to

14  being nothing but estimates or averages, but no provision of

15  how those were arrived at.  Simply, it is their ipse dixit from

16  a report that was created for litigation saying this is our

17  cost per watch.  This much for the movement, this much for the

18  watch itself, and then for shipping and so on.  All that is

19  unsupported.  So I don't think they've met their burden on

20  that.

21             Going over to overhead, for sure they haven't met

22  their burden on that because what they did is everything that

23  wasn't direct cost they lumped together for the whole company

24  and they divided it up somehow by some formula among the

25  watches.  Well, the Second Circuit has made very clear that

D6QHAUD2                          Mr. Benschar - Summation

1    while you can get -- in an intellectual property case you can

2    reduce your profits by overhead, but you have a burden to show,

3    to break out the overhead costs into distinct categories and

4    show how each category has a nexus between that cost and the

5    sale of the infringing item.  You can't just lump it

6    altogether.

7            What the defendants have done here simply doesn't meet

8    their burden.  Similar things have been rejected by courts in

9    both trademark and copyright cases, and again, we will have a

10   briefing so we will go into that in more detail.  So we think

11   the court should award the full amount of sales.

12           Now, one other point before I respond to some things

13   Mr. Sheinbaum said.  We also maintain that this is a

14   counterfeit because it is substantially indistinguishable from

15   one of our registrations.  The Second Circuit says, the

16   counterfeit is determined by what a consumer would think, not

17   what an expert would think.  The difference that that makes

18   here is under 15, U.S.C., 1117(b), if you have a willful use of

19   a counterfeit mark, you are entitled to mandatory treble

20   damages and mandatory attorneys' fees.  So if the court finds

21   it is counterfeit, then we fall under that remedy as well.  And

22   of course, we are going to be asking for attorneys' fees as

23   well whether or not it is counterfeit.

24           Let me just briefly respond to one point.  I think I

25   responded to most of the points.  In terms of the standing of

D6QHAUD2                         Mr. Benschar - Summation

1    the North American, Audemars Piguet North America, the problem

2    with Mr. Sheinbaum's argument is he neglects -- there is a

3    difference, the courts recognize, between Section 32 and

4    Section 43(a).  Section 32 by its terms does require a

5    registrant, and the registrant is a coplaintiff, Audemars

6    Piguet Holding.  However, Section 43(a) says:  Any party that

7    is damaged or even believes it is damaged by the infringement

8    can bring suit.

9          There are a number of cases.  In fact, the Calvin

10   Klein case, which Mr. Springut worked on, which they cite in

11   their papers, makes this exact distinction.  It says, well,

12   that party was a licensee or distributor.  I forget which.  It

13   said, you don't have standing as a Section 32 but you do have

14   standing under Section 43(a), and Judge Katz permitted that

15   case to go forward on that basis.

16         So clearly this is the exclusive distributor.  The

17   North American company makes its money by selling Audemars

18   Piguet watches.  That is all they sell, and 75 percent is Royal

19   Oak in North America.

20         THE COURT:  If you are right, if 32(a) doesn't count

21   for North America.  But I think what you are saying is it does

22   count for the Swiss company.  How does that affect anything?

23   Why would anything change as a consequence?  What do you think

24   Mr. Sheinbaum is saying about that?

25         MR. BENSCHAR:  He wants that one company out of the

D6QHAUD2                          Mr. Benschar - Summation

1    case.

2              THE COURT:  What would do that do?

3              MR. BENSCHAR:  Well, one of the differences is,

4    depending on how your Honor rules on the notice issue, that

5    company may be entitled to -- because 43(a), you are entitled

6    to, even without notice --

7              THE COURT:  I understand the Lanham Act.  I am not

8    clear about what it is that will happen with respect to 32.

9              MR. BENSCHAR:  It relates to the period of damages.

10   Depending upon how your Honor rules on the notice issue.  If

11   your Honor rules as we argue, it really makes no difference.

12   But if your Honor adopts the defendants' arguments, the problem

13   is the marking statute, which is Section 29, only relates to a

14   registrant.  Now, Audemars Piguet North America is not the

15   registrant.  So the limitation related to notice does not apply

16   to that company.  So it would make a difference.

17             We argue this in our brief on, I believe in the in

18   limine, that that company would be entitled under Section 43(a)

19   to profits beginning at the, really at the inception of the

20   infringement.  So it could make a difference depending on how

21   your Honor rules on the other issue.  So the two are

22   interrelated.

23             I agree, if your Honor rules the way our position is

24   that Section 43(a) does not require -- and the counterfeiting,

25   incidentally, the counterfeiting, 1117(b), does not require any

1   notice at all, then it makes no difference.  They are just

2   coplaintiffs.

3        Let me close with the following thought.  The thing

4   that I found mysterious about this case, the defendants say

5   this is less than 1 percent of their business.  So why have

6   they fought this case so hard.  It is one thing if we sued

7   someone and said, look, we want to shut down your whole

8   business.  I can understand someone would fight very hard in

9   that situation.

10        This is a situation where we are saying 99 percent of

11   your business we really couldn't care less about.  Less than 1

12   percent we have a big problem with it.  Why are the defendants

13   fighting this so hard?  I think that this demonstrates their

14   willful indifference.  Their attitude is we will use whatever

15   designs we want and if someone complains, it is the cost of

16   doing business.  We will litigate.  And sooner or later, just

17   your shenanigans, as Mr. Ben-Shmuel testified, and sooner or

18   later we will pay some lawyers and that is the cost.  We are

19   making $4 million off this.  So if we have to pay half a

20   million dollars to Mr. Sheinbaum and his cocounsel down in

21   Florida, so be it.  It's worth it to us.  I think that is what

22   that demonstrates.  Otherwise, it really makes no sense.

23        Therefore, it is important for the court, as the

24   Second Circuit said in the WEB Basset case, to take out, all

25   profit out of infringement to deter people from infringing.

D6QHAUD2                        Mr. Benschar – Summation

1    Not to have people have an attitude, I'll sell an infringing

2    watch or a product and if I ever get caught, called on it, I'll

3    litigate a little and then we'll settle and meanwhile I've made

4    a lot more money than what it's cost me, so that is the cost of

5    doing business.  To spend $4 million, I will spend half a

6    million in legal fees.  That is why it is important, as the

7    Second Circuit said, to give a strong remedy in this case and

8    to deter the defendants and others from doing this again.

9           THE COURT:  Well, I thank you both and we have a date

10   for findings of fact and conclusions of law.  So I look forward

11   to reading all of those pearls as well.

12          MR. BENSCHAR:  Your Honor, just one housekeeping

13   thing.  I made a mistake on my calendar yesterday.  The date I

14   gave you was a problem.  Could we just move it -- Mr. Sheinbaum

15   has consented -- can we move it one day later, to July 17th, if

16   that is all right with you?

17          THE COURT:  What is that going to do to your vacation?

18          MR. BENSCHAR:  Nothing.

19          THE COURT:  So why are we moving it?

20          MR. BENSCHAR:  Because the 16th is a fast day and I am

21   going to be out the whole day.  So if we can just move it one

22   day to the 17th.

23          THE COURT:  That is fine.

24          MR. BENSCHAR:  All right.

25          Thank you very much, your Honor.

D6QHAUD2                          Mr. Benschar - Summation

1            THE COURT:  Thank you, both.  I learned a lot.  We

2   will see what happens.

3            (Trial concluded)