UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| AUDEMARS PIGUET HOLDING S.A., | : |
| AUDEMARS PIGUET (NORTH AMERICA) | : |
| INC., | : |
| **Plaintiffs,** | : |
| | : |
| - against - | : |
| | : |
| SWISS WATCH INTERNATIONAL, INC. | : |
| d/b/a SWISS LEGEND d/b/a SWI GROUP; | : |
| ILS HOLDINGS, LLC d/b/a | : |
| *WORLDOFWATCHES.COM,* and | : |
| LIOR BEN-SHMUEL, | : |
| **Defendants.** | : |

12 Civ. 5423 (HB)

**OPINION & ORDER**

-------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiffs Audemars Piguet Holding S.A. ("APSA") and Audemars Piguet (North America) Inc. ("APNA") (collectively "Plaintiffs") bring this action against Defendants Swiss Watch International Inc. ("SWI"), ILS Holdings, and Lior Ben-Shmuel (collectively "Defendants") alleging trade dress infringement under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a), New York common law, and N.Y. Gen. Bus. Law § 360-1. Defendants bring counterclaims for cancellation of Plaintiffs' federal trademark registrations Nos. 2,866,069 and 3,480,826. The Court conducted a four-day bench trial beginning on June 17, 2013 and concluding on June 26, 2013. Below are the Court's findings of fact and conclusions of law as required under Fed. R. Civ. P. 52(a)(1).

## FINDINGS OF FACT

### A. The Parties

Plaintiff APSA, a holding company organized under the laws of Switzerland, owns all trademarks and trade dress rights concerning all Audemars Piguet brand watches. Ex. P101-P104. Plaintiff APNA, a Delaware Corporation, is a licensee of those rights and the exclusive U.S. distributor of all Audemars Piguet brand watches. *Id.*

Defendant SWI is a Delaware corporation that has acquired all assets of Defendant ILS Holdings through a merger after they were both acquired by Clearlake Capital Group L.P. Tr. 196:12-197:24. SWI operates the website *WorldofWatches.com.* Tr. 199:3-5. Defendant Lior

Ben-Shmuel was a Co-Chief Executive of SWI until recently, when his title became Senior Advisor and Board Member. Tr. 196:5-7; 197:1-12.

## B. Plaintiffs' Royal Oak Watch

### 1. The Royal Oak Design and Trademark Rights

In 1972, Plaintiffs introduced the "Royal Oak" line of luxury watches, bearing a design of an octagonal shaped bezel with eight hexagonal screw-heads. Nolot Decl. ¶ 9. A variation of the line bearing the same design elements had been introduced in 1993 as the "Royal Oak Offshore." Tr. 45:16-18.

APSA owns four trademark registrations for various aspects of the Royal Oak Design. U.S. Trademark Registration No. 2,866,069, registered on July 27, 2004, is for the design of an octagonal bezel with eight screws for watches and other watch-related items. Ex. P-102. U.S. Trademark Registration No. 3,480,826, registered on August 5, 2008, is for an octagonal bezel with eight screws for watches and other jewelry items. Ex. P-101. U.S. Trademark Registration Nos. 4,232,239 and 4,232,240, both issued on October 30, 2012, are for the full design of the Royal Oak watch, respectively with and without a metallic bracelet. Exs. P-103, P-104.

### 2. Functionality of the Royal Oak Design

Plaintiffs argue that the Royal Oak design does not give Royal Oak watches any competitive advantage over any alternative designs. Nolot Decl. ¶ 39. Royal Oak watches are neither more effective than watches of other designs nor do they have an advantage in terms of utility or manufacturing costs. *Id.* Indeed, both Defendants and Plaintiffs produce and market watches of other designs. *See* Ex. P-30, attaching Defendants' catalogue of watches from the 2011 BaselWorld fair. Defendants sell many different watch collections and the allegedly infringing watches make up only 1.5% of Defendants sales. Tr. 270: 13-18. Defendants' own sales substantiate the argument that effective and competitive watches can be made without utilizing the design at issue.

Defendants argue that the octagonal shape is one of the few shapes available for a watch face, and thus is functional. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 218-19 (2d Cir. 2012)("A product feature is considered to be 'functional' in a utilitarian sense if it is (1) essential to the use or purpose of the article, or if it (2) affects the cost or quality of the article. A feature is essential if [it] is dictated by the functions to be performed by the article," and observing that features deemed "functional" may not be protected as

2

trademarks.) However, it is not the octagonal shape alone that Plaintiffs seek to protect, it is the trademarked design in its entirety, including the octagonal bezel with eight hexagonal flat screws placed around the bezel. Indeed, Defendants have manufactured another watch with an octagonal face, *see* Tr. 85:11-25; 86: 7-10, that Plaintiffs do not allege infringes their trademark rights. Based on the evidence presented, I find that Plaintiffs' Royal Oak design is not functional.

### 3. Sales

The Plaintiffs' least expensive Royal Oak watches start at around $15,000 per watch and escalate to over $1 million. Ex. P-212. From 2010 through the first 11 months of 2012, total sales of Royal Oak watches were in excess of 9,350 units, with revenue in excess of $167 million. Ex. P-213. Royal Oak watches constitute approximately 75%-80% of Audemars Piguet's U.S. sales. Nolot Decl. ¶17; Tr: 42:11-44:23. Audemars Piguet is frequently among the top three watch brands in revenue sold by authorized retailers, behind brands such as Cartier and Rolex. Nolot Decl. ¶ 17.

### 4. Advertising and Promotional Efforts

In the United States, Plaintiffs have advertised Royal Oak watches in widely read newspapers and magazines such as *The New York Times, The Wall Street Journal,* and *Vanity Fair,* and in industry magazines, such as *WatchTime* and *W.* Nolot Decl. ¶ 22. Ex. P-215; Rule 1006 Summary of P-217 to P-227. Plaintiffs also advertise their brand through sponsorship of charity and recreational events, including the Tony Awards, and yachting and golf tournaments. Nolot Decl. ¶ 28; P-210, P-211, P-228. Plaintiffs have undertaken a number of other advertising and sponsorship endeavors to target high-end consumers. Nolot Decl. ¶¶ 29, 30; *see* Exs. P-230 through P-235. Between 2010 and 2012, Plaintiffs spent $881,787 promoting Royal Oak watches in American magazines and newspapers. *See* Ex. P-215.

### 5. Recognition of the Royal Oak design in the Press and Among Consumers
#### a. Press Commentary

The Royal Oak watch has been featured in both general media and specialty watch press. *See* Rule 1006 Summary of P-239 to P-250. One example is a December 2011 *New York Times* article, placing the Royal Oak on "[t]he list of truly classic watches," one of a very few "timeless icons of the watchmaker's art," and comparing it to other well-known watch brands such as Rolex and Cartier. Ex. P-253. Plaintiffs' submissions also include comments from specialty

magazines including *Wallpaper*, *WatchTime* and *Barrons*, each of which observe that the Royal Oak is a "classic" or an "icon." *See* Rule 1006 Summary of P-239 to P-250 and attachments.

### b. Similarity of Third Party Watch Designs to the Royal Oak Design

Defendants have presented evidence of other watch designs that utilize an octagonal shape, some of which also include screws. Tr. 62:10-12; 81:8-9; Ben-Shmuel Decl. ¶ 38; *see also* Exs. D-104, D-129, D-132, D-130, D-130A, D-131, D-132, D-133. Defendants observe that the Cartier Santos watch includes an octagonal bezel with flat head screws and was sold during the 1980s and 1990s. Tr. 62:13-18; D-17 at 31; D-78. Although the Cartier Santos does resemble the Royal Oak design, in that it includes an octagonal bezel with eight screw heads, no evidence has been submitted regarding when and how many of these watches were sold. While there are other watches that appear to imitate the Royal Oak trade dress – notably Michael Kors and Tommy Hilfiger watches, *see* Exs. D-130 & D-132 – Plaintiffs are addressing these infringements and are in negotiations with both companies. Tr. 176:1-19, 177: 21- 178:16. Indeed, at the time of trial, Michael Kors had already withdrawn its inventory of allegedly infringing items. Tr. 176: 1-19. Furthermore, the examples Defendants present do not resemble the Royal Oak design as closely as Defendants' watches at issue here. For example, Defendants point out that their own Octomatic watch, while it utilized an octagonal bezel, was not targeted for trademark infringement by Plaintiffs. *See* Tr. 85:11-25; 86: 7-10. However, the Octomatic only features an octagonal bezel, and does not include the flat, evenly-spaced screws that the Royal Oak and the Trimix have in common.

## 6. Consumer Recognition: Expert Reports

Plaintiffs and Defendants both retained experts, each of whom submitted reports considering the extent, if any, of post-sale confusion caused by the similarity of Defendants' Trimix Watches to the Royal Oak design.

### a. Plaintiffs' Expert: Dr. Sidney Lirtzman

Plaintiff's retained Dr. Sidney Lirtzman, President of Fairfield Consulting Associates, a consumer survey consulting company. Dr. Lirtzman conducted a consumer survey and prepared a report based on the survey. The Lirtzman Report was created by intercepting consumers at jewelry and watch stores in New York, Chicago, Los Angeles and Webster, Texas (a suburb of Houston). Lirtzman Report at 4. Shoppers were screened on their eligibility to participate in the study, and were only permitted to participate if they either owned a watch worth at least $15,000

or were "very likely" to consider buying a watch of that value in the next year. *Id.* at 8. Interviews were conducted by market research workers supplied by four different independent market research fieldwork companies. *Id.* at 4.

Respondents were shown life size, color photographs of either men's and women's wrists with different watches, including the Swiss Legend Trimix Diver Chronograph Watch or the Swiss Legend Trimix Diver Ladies Watch. *Id.* at 2-3. They were asked to identify the maker of the watch and the basis for that belief after viewing photographs of the men's or women's watches, along with Timex and Movado watches, which served as controls, for 10 seconds. *Id.* at 2-4. Of the respondents who viewed the men's Trimix, 37% of respondents believed it was an Audemars watch; for the women's version, 32% stated it was an Audemars watch. *Id.* at 4. In addition, 5% of respondents who viewed the men's Trimix and 6% who viewed the women's Trimix believed that the watch was an imitation or "knockoff" of an Audemars watch. *Id.*

### b. Defendants' Expert: Mr. James Berger

Defendants retained expert James Berger, a faculty member at Roosevelt University and Principal of James T. Berger/Market Strategies, a marketing and consulting firm. Mr. Berger criticized several aspects of the Lirtzman Report, including the location of the surveys, eligibility screening, the manner in which the watches were displayed and several methodological aspects of the survey.

Mr. Berger first argues that the location of the survey interviews in jewelry stores in which Audemars watches were on display biased the respondents. Berger Report ¶ 10. However, Defendants do not dispute that these stores displayed many different brands of watches and jewelry. Tr. 318: 1-319:12. Indeed, similar surveys have been credited by other courts in this district. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 231 (S.D.N.Y. 2004) (crediting Dr. Lirtzman's report on secondary meaning despite the fact that surveys were conducted in stores that sold Plaintiffs' brand watches because influence of Plaintiffs' trade dress in stores selling many brands, including Plaintiffs' brand "is so minimal as to have little to no effect on the probative value of Lirtzman's report.") Here, as in *Cartier*, Audemars Piguet was one of 15-25 brands sold and displayed at the stores where the surveys were conducted, and Audemars Piguet watches were neither more prominently displayed than other watches, nor were surveys conducted near Audemars Piguet's displays. Nolot Decl. ¶¶ 19-20.

In his report, Mr. Berger also criticizes the eligibility screening for participants because those that already owned $15,000 watches and those very likely to consider buying a watch in that price range were included. However, these are exactly the type of consumers that are appropriate for this survey – individuals who have or would consider purchasing Audemars watches in this price range. Indeed, Mr. Berger testified to this effect despite the contrary conclusions in his report. Tr. 326:5-19.

In addition, Mr. Berger criticizes the way the watches were presented to survey participants – in life size color photographs on a man or woman's wrist – because "[n]obody would ever look at a watch in this manner." Berger Report at 9. While it is true that these conditions do not *exactly* replicate real life conditions, I agree with the court in *Cartier* that consumer surveys "cannot be conducted in a vacuum." *Cartier*, 348 F. Supp. 2d 217, 231 (S.D.N.Y. 2004). I find that the size and color presentation of the photos created satisfactory conditions for a consumer survey that is sought to shed light upon the likelihood of post-sale confusion. Indeed, the ability of consumers to identify the Movado and Timex controls supports this conclusion.

Finally, in his testimony, Mr. Berger criticized the survey method, including the use of controls and market research companies. However, neither of these criticisms is cause for alarm as Dr. Lirtzman explains that the use of Timex and Movado control watches sufficiently demonstrated that the survey protocol – 10-second viewings of life-size color photographs – permitted survey respondents to view and assess the watch brands. Lirtzman Supp. Decl. ¶ 12. Indeed, by using both the Timex watch, with its brand name prominently displayed on the face, in addition to the Movado watch, with a well-known design and a barely visible brand name, the controls demonstrate that survey participants could see and assess both brand name and design. *Id.* With respect to the use of market research surveys and Dr. Lirtzman's survey in particular, his use of market research companies and control watches was appropriate and his testimony credible with respect to the likelihood of post-sale confusion.

## C. Plaintiffs' Efforts to Protect Its Trade Dress

### 1. Generally

Plaintiff Audemars Piguet Holding S.A. ("APSA") is a holding company organized under the laws of Switzerland. APSA owns all trademarks and trade dress rights concerning all Audemars Piguet brand watches. Ex. P101-P104. Plaintiff Audemars Piguet (North America)

Inc. ("APNA"), a Delaware Corporation, is a licensee of those rights and the exclusive U.S. distributor of all Audemars Piguet brand watches. APSA enforces its intellectual property rights by participation in the Swiss Watch Federation (the "Federation"). Among other enforcement efforts, the Federation coordinates collective legal actions against counterfeiters, cooperates with local customs agents to stop counterfeit imports, and monitors websites for infringing and counterfeit items. Burgener Decl. ¶ 16. The Federation's legal actions have resulted in the removal of more than 100 counterfeiting websites in the U.S., and future litigation targeting 200 websites is planned. Burgener Decl. ¶ 16; Tr. 141: 14-21. In 2012, the Federation's monitoring activities removed 6,969 offerings that infringed on APSA's rights. Burgener Decl. ¶ 17. In addition, from January 1, 2013 until the time of this trial, the Federation identified 1,184 websites infringing on Plaintiffs' trademarks; Plaintiffs have taken action against these websites, including cease and desist notifications. *Id.* Until recently, APSA used the services of Vanksen SA, an external monitoring company, which reported counterfeit websites to them, after which cease and desist letters were sent, resulting in the closure of some counterfeiting sites. Burgener Decl. ¶ 18. In addition, APSA has worked with U.S. Customs and Border Patrol since 2010, and assists that agency in seizing and destroying counterfeit goods found at customs. Burgener Decl. ¶ 19. Plaintiffs have sent multiple cease and desist letters to companies selling watches that imitate the Royal Oak design. Burgener Decl. ¶ 20; *see also* P-110 and attachments. Plaintiffs have also pursued direct legal action against infringing companies, including a 2011 lawsuit in this district court, which settled, and another case involving a California company that settled without litigation. Burgener Decl. ¶ 20; Tr. 169:20-170:3.

### 2. With Respect to Defendants' Trimix Watches

Plaintiffs became aware of Defendants' Swiss Legend Trimix ("Trimix") watches at the BaselWorld Watch and Jewelry Show ("BaselWorld") in March 2011. Burgener Decl. ¶ 4. On May 3, 2012, APSA sent a cease-and-desist letter to Defendants, alerting them of its claim of trade dress rights and one federal registration, and demanding that sales of the accused watches cease immediately. Ex. P-16.

## D. Defendants' Trimix Watch

### 1. Trimix and Ladies Trimix

Plaintiffs charge Defendants' Swiss Legend Trimix watch, also known as the Trimix Divers Men's Chronograph, bearing SKU 10541,[1] and the women's version, bearing SKU 10534, with infringing on the Royal Oak design and trade dress. Although the components of the watches may vary, including the dial, strap, and case, the basic design of the watch is the same for all watches sold under those model numbers. Tr. 203: 6-205:4; *see* Exs. P-2, P-3, P-13, P-14. These watches show a list price of $995, but sell for between $79 and $249. Tr. 232: 20-22.

The Court finds that the Defendant's Trimix watches are indeed quite similar to the Royal Oak design, in their octagonal bezel with eight flat head screws spaced out around the bezel. The spacing between screws is slightly different – the Trimix screws are grouped in pairs around the bezel, while the Royal Oak screws are spaced individually along the bezel. Although Defendants' Trimix watch bears the Swiss Legend logo in red on its face and on the watch band and includes a prominent canteen crown, *see* Tr. 274: 19-22 ("[T]he canteen [is] the screw down crown than protects the actual watch"), the similarities between these watches remains striking.

### 2. Timing of Defendants' Entry into the Market with Its Watches

Defendant SWI began making and selling the Trimix watch, bearing SKU 10541, in August 2010. Tr. 205:5-7. Defendant SWI introduced a women's version, bearing SKU 10534 in 2012. Tr. 205: 8-12.

### 3. Defendants' Activities With Respect to the Watches at Issue
#### a. Source of Defendants' Watches

Trimix watches are produced by Solar Time, a company with offices in Hong Kong and China. Tr: 205: 18-206:2. In 2009, during the course of their regular production process, Solar Time provided a design sketch of the Trimix to SWI. In response, an SWI design team, led by Defendant Lior Ben-Shmuel ("Ben-Shmuel"), revised the design, doubling the number of screws from four to eight and repositioning them around the bezel, making the Trimix design more similar to the Royal Oak design. Tr. 208:18-202:20, 249:24-252:12; Ex. P-4.

#### b. Extent of Defendants' Sales of Accused Watches

Defendant SWI has sold Trimix watches on its own retail website, as well as through other retail websites, such as Amazon.com. *See* P-18 to P-24, P-50. SWI's chief financial officer

---

[1] The SKU numbering system used is SL-10541-XXX, with the extension code identifying the color. The women's model follows the same system, but with the SKU beginning SL-10534-XXX.

Sergio Rodicio presented a summary of SWI's business records, which showed total sales from the inception of the Trimix models in mid-2010 through the end of April 2013 to include more than 43,000 watches, with total dollar sales of $4,379,000. Ex. D-137.

### c. BaselWorld 2011

In March 2011, SWI displayed the Trimix watch, among others, at BaselWorld, an important industry trade show. SWI was operating a booth there, and Ben-Shmuel was in charge. Burgener Decl. ¶ 11-12; Tr. 252:13-25. After seeing the Trimix watch on display and noting the similarities, APSA filed a complaint with the BaselWorld dispute resolution panel. Subsequently, the panel met and required SWI to remove all Trimix watches from displays, signage and promotional materials the following day. Burgener Decl. ¶ 14; Ex. P-107; *see* Tr. 254:2-11.

### d. Defendants' Reaction to Plaintiffs' Enforcement Actions

Defendants did not take any action in response to Plaintiffs' May 3, 2012 Cease and Desist Letter. Tr. 266:2-269-2; Ex. P-17. Defendant Ben-Shmuel testified that after the commencement of this litigation, Defendants have not made any new orders, but have continued to receive and sell watches from orders that had already been made. Tr. 269:3-16.

## CONCLUSIONS OF LAW

Plaintiffs seek injunctive relief and damages for Defendants' alleged sale of watches bearing its Royal Oak watch design trademarks in violation of the Lanham Act Sections 32(1) and 43(a), 15 U.S.C. 114(1) and 1125(a), New York common law, and New York General Business Law § 360-1. Defendants' counterclaim to cancel Plaintiffs' federal trademark registrations Nos. 2,866,069 and 3,480,826.

### A. General

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, with pendent jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §§ 1367 and 1338.

APSA is the owner and registrant of the four asserted trademarks, and as such has standing to bring all asserted claims, including under Section 32(1) of the Lanham Act, which requires the Plaintiff to be a "registrant" of the asserted marks. Although APNA is neither the holder nor the registrant of the trademarks in question, APNA does have standing as an exclusive distributor under Section 43(a) of the Lanham Act, as a "person who believes that he or she is or

is likely to be damaged" by Defendants' actions in offering for sale products bearing allegedly confusing designs. 15 U.S.C. § 1125(a); *see Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 172 (S.D.N.Y. 1998)(Distinguishing between Section 32(1) claims and Section 43(a) claims, because"[i]n the former case, the plaintiff must have an ownership interest in the mark but, in the latter, the plaintiff need show only potential commercial or competitive injury," and holding that an exclusive distributor had standing for 43(a) claims based on its pecuniary interest.)

### B. Standard of Review

In order to secure a permanent injunction, a plaintiff must show both (1) irreparable harm, and (2) success on the merits. *Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 225 (S.D.N.Y. 2004). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits." *Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003). "In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995).

### C. Trade Dress

Section 43(a) of the Lanham Act prohibits the use of "any word, term, name, symbol or device, or any combination thereof" which is "likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). Section 32(1) of the Act additionally requires that the mark be registered. 15 U.S.C § 1114(1). The Second Circuit instructs that courts must exercise "particular caution when extending protection to product designs." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 114 (2d Cir.2001) (citing *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 380 (2d Cir.1997)(internal quotations and citations omitted). Indeed, "the Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets," because misdirected enforcement of this statute could "hamper efforts to market competitive goods*" Landscape Forms*, 113 F.3d 373, 379-380 (2d Cir. 1997).

"A plaintiff asserting trade dress rights in the design of a product is therefore required to surmount additional hurdles. In any action under § 43(a), the plaintiff must prove (1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion

between its good and the defendant's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001). Further, "[f]unctional product design is not protected under Section 43(a) of the Lanham Act." *Cartier*, 348 F. Supp. 2d at 240-41; *see* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.") However, where marks have been registered as trademarks, as here, such registration "is prima facie evidence that the mark is registered and valid (*i.e.,* protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce. . . . In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence that the mark is ineligible for protection." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 n. 10 (2d Cir. 2012)(internal citation and quotation marks omitted).

**1. Distinctiveness or Secondary Meaning**

A plaintiff asserting product design trade dress infringement must prove distinctiveness by showing that that "'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning')." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-211 (2000). Where products target a certain consumer group, "[t]he plaintiff is not required to establish that *all* consumers relate the product to its producer; it need only show that a substantial segment of the relevant consumer group makes this connection." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). To determine whether a secondary meaning has attached, the court considers six factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. " *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 618 (2d Cir. 2008). Considering each factor in turn:

    i.  Advertising Expenditures

Plaintiffs have spent $872,787 dollars on advertising for the Royal Oak line in the period 2010-2012, and have continued to build the brand through other methods, including sponsoring charity events, establishing relationships with celebrity spokespersons and targeting advertising

at locations high-end consumers would frequent, such as heliports and private airports. This factor then weighs in favor of Plaintiffs.

    ii.  <u>Consumer Studies</u>

Although the Lirtzman study focused on post-sale confusion, it also provides support for secondary meaning. Despite the fact that the watches in the study had a Swiss Legend logo on their faces, those who identified them as Audemars watches nonetheless listed the aspects of the Royal Oak trade dress design as the reason, including the octagonal shape of the watch (23%), the style, design or shape of the watch dial (20%), the octagonal bezel and shape or look (15%), similar bezel (13%), bezel and screws (10%), the octagonal shape (8%). *See* Lirtzman Report at 6. These responses support the secondary meaning of the design as distinctive to the Audemars Piaget brand or source, again weighing in favor of Plaintiffs.

    iii.  <u>Media Coverage</u>

Media coverage referring to the Royal Oak design as "classic" and "iconic" also weighs in favor of Plaintiffs.

    iv.  <u>Sales Success</u>

Audemars Piaget's revenue was often among the top three luxury watch brands for its authorized retailers. Between 2010 and 2012, Royal Oak sales generated $167 million in revenue, though the number of units sold in the United States each year hovers around 3,000. This factor is neutral: the high revenue weighs in favor of Plaintiffs, but the low volume favors Defendants.

    v.  <u>Attempts to Plagiarize</u>

Plaintiffs send several cease and desist letters each year to companies attempting to plagiarize the mark. In addition, the video that the Plaintiffs showed during their opening statement demonstrated a vendor attempting to make a comparison between Defendants' Trimix and Plaintiffs' Royal Oak, specifically positioning the Trimix for those who could not afford the expense of the Royal Oak. Thus, this factor weighs in favor of Plaintiffs.

    vi.  <u>Length and Exclusivity</u>

The Royal Oak design was created in 1972 for Audemars Piaget's exclusive use. Though Defendants show other watches which utilize an octagonal design to suggest that the Royal Oak design has not been exclusive, Plaintiffs have taken legal action against some infringers, and several of Defendants' examples do not closely resemble the Royal Oak design. Indeed, in his

declaration, Ben-Shmuel identifies two octagonal watches that he suggests detract from the exclusivity of Plaintiffs' marks. Ben-Shmuel Decl. ¶¶ 58-59. However, the Bulgari watch does not have any screw heads, making it different than the Royal Oak registered mark. *See* Ex. D-10C at 1-3. The Cartier Santos does have screw heads, making it more similar to the Royal Oak design. *Id.* at 5. However, Defendants failed to produce any evidence showing the location and extent of sales of this watch, making it impossible to gauge the extent of the exposure or whether this was a credible challenge to the exclusivity of Plaintiff's mark. In addition, Plaintiffs have shown steps that they take to protect this mark and maintain exclusivity over its use and designs. Therefore, this factor too favors Plaintiffs.

Because the majority of the factors weigh in favor of Plaintiffs, the Royal Oak design has established a secondary meaning.

### 2. Likelihood of Confusion

"[T]he law of this Circuit requires that courts consider the eight factors elaborated in *Polaroid [v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961)] in determining whether there is a likelihood of confusion. These factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap...; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 745 (2d Cir. 1998)(internal citations and quotations omitted). "The *Polaroid* analysis is not a mechanical measurement. When conducting a *Polaroid* analysis, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 119 (2d Cir. 2001)(internal citations and quotations omitted). In this case, Plaintiffs allege that Defendants have created post-sale confusion. *See Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 n. 2 (2d Cir. 2005) ("The Lanham Act protects against several types of consumer confusion, including *point-of-sale* confusion, *initial interest* confusion, and *post-sale* confusion, and the *Polaroid* factors must be applied with an eye toward each of these"(emphasis in original)(internal citations omitted)).

### i. Strength of Trade Dress

This factor considers "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly

anonymous source." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993) (limited on other grounds); *see also Cartier,* 348 F. Supp. 2d 217, 245 (S.D.N.Y. 2004). My discussion above regarding the secondary meaning or distinctiveness of the mark guides my analysis here. *See Cartier*, 348 F. Supp. 2d at 245 (S.D.N.Y. 2004); *PAJ, Inc. v. Barons Gold Mfg. Corp.,* 02 CIV.1465(VM)(KNF), 2002 WL 1792069, at *2 (S.D.N.Y. Aug. 2, 2002).

As I observed above, Plaintiffs have directed advertising towards relevant consumer groups and have elicited press comments concerning the "classic" or "iconic" status of the Royal Oak design. They have generated significant revenue from Royal Oak sales. Finally, the Lirtzman study, though focused on post-sale confusion, also supports the recognition that high-end consumers have for the mark. Even though the Trimix watch included the Defendants' brand name on its face, over 30% of respondents thought the watch was produced by Audemars Piaget. This evidence demonstrates that the trade dress is quite strong and weighs in favor of Plaintffs.

ii. Similarity of the Marks

This factor considers whether "the similarity is likely to cause consumer confusion." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 139-40 (2d Cir. 1999)(internal citation omitted). Further, "the test ... is whether confusion is probable among numerous customers who are ordinarily prudent." *Id.* at 140 (internal quotations and citations omitted). In addition, to evaluate post-sale confusion, a side-by-side comparison is not appropriate; rather, "a district court must ask not whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." *Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 538 (2d Cir. 2005). Indeed, "consumers will generally not see watches such as plaintiffs' and defendants' displayed side-by-side; rather, the watches will often be viewed in isolation in display cases, in catalogs and on wearers' wrists." *Cartier*, 348 F. Supp. 2d at 245.

Here, both watches have an octagonal bezel with eight flat screws spaced out around the bezel. Defendants have pointed to differences between the watches – namely the canteen on the Trimix watch that does not appear in the Royal Oak design. However, absent a side-by-side comparison, it seems likely that a consumer would not notice the difference in the canteen or would assume that the canteen is simply an aspect of a different Royal Oak design. Because of the significant similarities between Plaintiffs' trade dress and the Trimix design, consumers could very well draw the conclusion that the Defendants' watch is a Royal Oak. Although it is

true that a *prominent* brand name may be dispositive on likelihood as to confusion, *see Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.2d 43, 46 (2d Cir. 2000), where, as here, the brand name is relatively small and as a result, an observer in a post-sale context may not be able to see it clearly, such a determination would not be appropriate. Accordingly, this factor also favors Plaintiffs.

iii. Proximity of Products

This factor "addresses whether, due to the *commercial proximity* of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir. 1988)(emphasis added). However, as both parties have noted, because *post*-sale confusion considers confusion subsequent to purchase, this factor, considering proximity at the time of purchase, is not relevant. *See* Defs.' Sum. Judg. Mem. at 13; Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 49.

iv. Likelihood of Gap-Bridging

"This factor involves a determination of the likelihood that the plaintiff will enter the defendants' business or of the average customer's perception that the plaintiff would enter the defendants' market." *Brockmeyer v. Hearst Corp.,* 248 F. Supp. 2d 281, 297 (S.D.N.Y. 2003)(internal citations omitted). "Under this factor, if the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source. We have held that the trademark laws are designed in part to protect the senior user's interest in being able to enter a related field at some future time. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 874 (2d Cir. 1986)(internal citations and quotations omitted). This factor is closely related to commercial proximity, *id.*, and, as with that factor, it is less relevant to post-sale confusion. Here, Plaintiffs have expressed neither interest nor intent to enter the Defendants' market. However, consumers may still believe that gap-bridging has occurred when they view the watches in a post-sale environment. This factor is neutral. Though Plaintiffs do not seem interested in bridging the gap, consumers observing Defendants' watches in a post-sale context may believe that gap-bridging has occurred based on the similarities between the watches.

v. Actual Confusion

"The Lanham Act does not require evidence of actual confusion as a prerequisite to recovery." *Cartier,* 348 F. Supp. 2d 217, 247 (S.D.N.Y. 2004)(citing *Lois Sportswear, U.S.A.,*

*Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986) ("it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source.") However, "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003).

Here, Plaintiffs seek to show likelihood of post-sale confusion through the Lirtzman Report, which I largely credited. "Proof of actual confusion, in the form of market research survey evidence, is highly probative of the likelihood of consumer confusion," *Empresa Cubana del Tabaco v. Culbro Corp.*, 97 CIV. 8399 (RWS), 2004 WL 602295, at *44 (S.D.N.Y. Mar. 26, 2004) *aff'd in part, rev'd in part on other grounds*, 399 F.3d 462 (2d Cir. 2005). As explained in greater detail above, the Lirtzman study found that 32% of respondents viewing the ladies Trimix and 37% of those viewing the men's Trimix believed these were Audemars watches. Lirtzman Report at 4. These figures are probative of confusion. *See Empresa Cubana*, 2004 WL 602295 at *44 (surveying cases holding that surveys showing 15-20% of respondents identifying the incorrect brand were probative of confusion). As I credited the results presented in the Lirtzman Report, this factor weighs in favor of Plaintiffs.

vi. Defendant's Good Faith

"The good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004)(internal quotations and citations omitted). Plaintiffs assert that Defendants acted in bad faith because (i) Defendant Ben-Shmuel made changes to the Trimix design to make it more like the Royal Oak design; (ii) while Defendants' list price was $995 for the Trimix, it generally sold for between $79 and $249.

Ben-Shmuel testified that at the time he developed the Trimix design, he did not consider the Trimix watch design to look like any other watch in the marketplace. Tr. 249: 6-9. This assertion stretches credulity. The Trimix was designed in 2009, at which time Ben-Shmuel had been in the

16

watch business for over 20 years. Tr. 196:5-7. It seems more likely than not that Ben-Shmuel made design changes to bring the Trimix design closely in line with the Royal Oak design, *see* Ex. P-4; Tr. 250:4-252:12, and that his changes were made to take advantage of Plaintiff's reputation and to create confusion. Even after the incident at BaselWorld in March 2011, the Defendants made no changes in the Trimix design, and this was so even after Ben-Shmuel found the patent in an online search. Tr.: 264:25-266:1. Indeed, Ben-Shmuel testified that Defendants did not even take action following the receipt of the cease and desist letter from APSA in May 2012. On balance, it seems very likely that Defendants acted in bad faith when designing and selling the Trimix; Ben-Shmuel's testimony that he was not aware of the similarities between the two watches stretches credulity. Thus, this factor too weighs in favor of Plaintiffs.

### vii. Quality of Defendant's Product

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995). The significance of this factor "is reduced in post-sale confusion cases, as such persons are not in a position to examine a product's construction and materials." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 240 (S.D.N.Y. 2012) (internal citations and quotations omitted). Here, neither party has presented evidence with respect to the quality of Defendants' product. Thus, I find this factor is neutral.

### viii. Sophistication of Buyers

"This final factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)(internal citations omitted). "[W]hile price differences are important in determining the sophistication of customers, they are not dispositive." *Id.* at 399. In making this determination, courts "must consider [t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)(internal citation omitted). In some circumstances there may be a presumption that consumers of expensive goods are more sophisticated and less likely to be confused. *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979)("The greater the value of an article the more careful the typical consumer can be expected to be..."). However, a sophisticated consumer of an expensive

item may also be *more* attuned to trademarks and the status and connection to the brand that a trademark conveys, and so may be more prone to post-sale confusion. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986) ("[I]t is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their 'meanings.'") Though sophistication of consumers may weigh in favor of Plaintiffs or Defendants, in this case, the evidence presented was inadequate to make a determination with respect to this factor.

Thus, considering all of the foregoing *Polaroid* factors, I conclude that Defendants' use of the allegedly infringing designs is likely to cause customer confusion.

### 3. Functionality

If a mark is "functional," it enjoys no trademark protection because "functional features can be protected only through the patent system, which grants a limited monopoly over such features until they are released into general use." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 218-19 (2d Cir. 2012). "The doctrine of functionality prevents trademark law from inhibiting legitimate competition by giving monopoly control to a producer over a useful product." *Id.* at 218. Courts may consider both "traditional" and "aesthetic" functionality. *Id.* at 219.

"[A] product feature is considered to be 'functional' in a utilitarian sense if it is (1) essential to the use or purpose of the article, or if it (2) affects the cost or quality of the article. A feature is essential if [it] is dictated by the functions to be performed by the article. It affects the cost or quality of the article where it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods." *Id.* Here, the trade dress at issue composed of an octagonal bezel with eight flat embedded screws is neither essential to the use or purpose of a watch nor does it affect the cost or quality of the article. While Defendants argue that the dress is functional because an octagon is one of only a limited number of shapes available for a watch, the trademark here does not protect that octagon shape standing alone; rather the combination of that shape *with* the eight screws spaced around the bezel is protected. Defendants themselves have created at least one other watch utilizing the octagon shape, *see* Tr. 85:11-25; 86: 7-10, that Plaintiffs do not allege infringes on the Royal Oak design.

Additionally, a mark may not be protected if it is deemed "aesthetically" functional; that is, "when the aesthetic design of a product is *itself* the mark for which protection is sought, we may also deem the mark functional if giving the markholder the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." *Christian Louboutin*, 696 F.3d at 219-20 (internal citation and quotation marks omitted). "[A] mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark *significantly* undermines competitors' ability to compete in the relevant market." *Id.* at 222 (emphasis in original). Here, there is no support for the idea that protecting this mark will hinder competition. Indeed, over 98% of SWI's sales are of watches that do not bear the marks at issue here. Tr. 270:16-18. Because the trademark at issue is neither traditionally nor aesthetically functional, it may be protected under the Lanham Act.

Having considered the relevant factors, I have determined that Plaintiffs' trade dress has acquired a secondary meaning, that there is a likelihood of confusion between its products and Defendants products, and that the claimed trade dress is non-functional. Thus, I conclude that Plaintiffs succeed on their Lanham Act trade dress infringement claim.

## D. New York State Law Claims

### 1. Common Law Unfair Competition

"The standards for Section 43(a) Lanham Act claims are virtually indistinguishable from unfair competition claims under New York law." *Cartier*, 348 F. Supp. 2d at 251 (internal citations omitted). In order to prevail, Plaintiffs must show (1) likelihood of confusion, and (2) bad faith. *Id.* Here, both of those factors have already been demonstrated, as discussed above. Thus, Plaintiffs succeed on this claim.

### 2. New York Dilution

Plaintiffs also make a claim for dilution under New York law. New York General Business Law § 360-1 provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360-l.

To prevail under a claim of dilution, a plaintiff must prove "(1) that it possesses a strong mark, one which has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood of dilution by either blurring or tarnishment." *Gucci,* 868 F. Supp. 2d at 241 (internal citations omitted). With respect to the first factor, my finding of a secondary meaning demonstrates that the trademark is strong and distinctive; accordingly, the first factor is met.

As to the second factor, here, Plaintiffs allege dilution by blurring, which occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *New York Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002)(internal citations and quotations omitted). "To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Id.* In addition, in contrast to federal dilution claims, "New York [state law] does not, for example, require a mark to be 'famous' for protection against dilution to apply." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010)(internal citations and quotation marks omitted). Finally, "[t]his proscription applies to competitors. . . as well as non-competitors." *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 73 (2d Cir. 1994)

To the extent that these factors largely overlap with those described in likelihood of confusion for Lanham Act violations, my analysis with respect to similarity of the marks, products covered, sophistication of consumers, and predatory intent, as discussed in analyzing the bad faith of Defendants, applies equally here. The renown of the senior mark is evident through the press comments previously discussed, *see* § B.5.a *supra*, and there has been no evidence admitted regarding the renown of the junior mark. Accordingly, Plaintiffs have established dilution by blurring under New York law.

### E. Individual Liability of Lior Ben-Shmuel

"[I]t is well established in this Circuit that [u]nder the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active conscious force behind [the defendant corporation's] infringement." *Chloe v.*

*DesignersImports.com USA, Inc.*, 07-CV-1791 (CS)(GAY), 2009 WL 1227927 at *11 (S.D.N.Y. Apr. 30, 2009)(internal citations and quotations omitted). "A showing that an officer authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient participation in the wrongful acts to make the officer individually liable." *Cartier, a Div. of Richemont N. Am., Inc. v. Samo's Sons, Inc.*, 2005 WL 2560382, at *10 (S.D.N.Y. Oct. 11, 2005) *aff'd sub nom. Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615 (2d Cir. 2008).

Here, Ben-Shmuel was the co-CEO of SWI and its predecessor companies at all relevant times covered by the design, production and sale of the Trimix watch. Tr. 197:1-18. Although Ben-Shmuel recently changed his title to senior adviser and board member, he remains involved in the operations of SWI. *Id.* Additionally, Ben-Shmuel led the team that created the infringing Trimix design, was personally involved in the BaselWorld incident and has made business decisions regarding the sale of Trimix watches. Tr. 249:24-253:4. Thus, Ben-Shmuel is individually liable for SWI's trademark infringements.

## F. Affirmative Defenses[2]

### a. Genericness

Trade dress may be considered generic when it "consist[s] of the shape of a product that conforms to a well-established industry custom" *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 (2d Cir. 1998)(internal citations and quotation marks omitted). For example, "[t]he packaging of lime-flavored soda in green twelve-ounce cans is a classic example of generic trade dress because it is so common in the soft-drink industry." *Id.* (internal citations and quotation marks omitted). However, here, as I have already held that Plaintiffs' trade dress established a secondary meaning, it is clear that their trade dress is not a well-established industry custom. In addition, the trademarks at issue are all registered, so Defendants bear the burden to establish invalidity by genericness, which they have not done. *See Christian Louboutin*, 696 F.3d at 216 n. 10.

### b. Failure to Enforce

---

[2] Defendants assert several arguments as affirmative defenses which I have already addressed, including functionality, use of trade dress by third parties, secondary meaning and likelihood of confusion.

"To establish the defense of abandonment [through failure to enforce against trademark infringement], it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir. 2000). Here, I have already discussed Plaintiffs' efforts to enforce their mark. In addition, I have held that their trade dress has acquired a secondary meaning. As such, Defendants have not met their burden to show failure to enforce their trademark, and this defense must fail.

### c. Door Closing Statute

Defendants have also argued that this litigation is barred by New York's door closing statute, § 1312(a) of the New York Business Corporation Law, which states, "A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes . . . ." N.Y. Bus. Corp. Law § 1312(a). This prohibition extends to diversity actions in New York's federal courts. *Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 566 (S.D.N.Y. 2009) (citing *Netherlands Shipmortgage Corp., Ltd. v. Madias*, 717 F.2d 731 (2d Cir. 1983)). Defendants argue that the statute applies to Plaintiff APSA, a Swiss corporation.

However, it must be kept in mind that "not all business activity engaged in by a foreign corporation constitutes doing business in New York." *Netherlands Shipmortgage*, 717 F.2d at 735-36 (citing New York state court cases). Rather, "in order for the Act to apply, 'the intrastate activity of a foreign corporation [must] be permanent, continuous, and regular for it to be doing business in New York.'" *MWH Int'l, Inc. v. Inversora Murten S.A.*, No. 11 Civ. 2444 (HB), 2012 WL 3155063, at *7 (S.D.N.Y. Aug. 3, 2012) (quoting *Netherlands Shipmortgage*, 717 F.2d at 736). Conversely, Section 1312(a) does not apply when a company's activities in New York are "merely incidental to its business in interstate and international commerce . . . ." *A.I. Int'l Corporate Holdings, Inc. v. Surgicare, Inc.*, No. 03 Civ. 2481, 2003 WL 22705128, at *2 (S.D.N.Y. Nov. 17, 2003) (citation omitted).

Defendants' argument that the door closing statute bars this litigation is unavailing. The parties do not dispute that Plaintiff APSA is a corporation organized under the laws of Switzerland and has no office or employees in New York, Burgener Decl. ¶¶ 2 & 7, and Defendants argue that Section 1312(a) applies to APSA because Plaintiff "has not provided

proof that it is authorized to do business in New York." Defs.' Sum. Judg. Mem. 19. However, because non-compliance with the statute is an affirmative defense, the burden of proof on that issue rests with Defendants, not Plaintiffs. *Fashion Fragrance & Cosmetics v. Croddick*, No. 02 Civ. 6294, 2003 WL 342273, at *7 (S.D.N.Y. Feb. 13, 2003); *see also Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4624, 2008 WL 1910503, at *9 (S.D.N.Y. Apr. 30, 2008) ("[T]he party invoking § 1312 has the burden to prove that the foreign corporation is engaged in regular, systematic activities in New York.") Defendants have failed to supply such proof.

Defendants' other arguments are equally unpersuasive. Defendants argue that Plaintiff APSA is doing business in New York because it seeks to enforce the U.S. trademarks through its New York counsel and because it fully owns its subsidiary, Plaintiff APNA, which promotes, markets, and distributes the watches bearing the trade dress at issue in this case. However, a single trademark lawsuit is not intrastate activity that is permanent, continuous, and regular. *Compare Uribe v. Merchs. Bank of New York*, 697 N.Y.S.2d 279, 280 (1st Dept. 1999) (holding that the statute did not apply to a foreign corporation that had no office, telephone listing, or employees in New York because its solicitation of business and facilitation of the sale and delivery of its merchandise was incidental to its business in interstate and international commerce), *with Scaffold-Russ Dilworth, Ltd. v. Shared Mgmt. Grp., Ltd.*, 682 N.Y.S.2d 765 (4th Dept. 1998) (holding that a foreign corporation was doing business in New York because it rented scaffolding to contractors at eight public and private construction projects in the state and leased a facility in the state for storage).

Defendants' reliance on *RMS Residential Props., LLC v. Naaze*, 903 N.Y.S.2d 729, 732 (Dist. Ct. 2010) for the proposition that APNA's business activities may be attributed to APSA is also misplaced. There, the Nassau County District Court held that the door closing statute applied to the plaintiff because it was a foreign subsidiary that attempted to rely on the parent corporation's New York Certificate of Authority for its own twenty-five foreclosure actions in New York. In contrast, here, it is the subsidiary, APNA, that is doing business in New York with full authorization, Burgener Decl. Ex. A, and its activities have no bearing on the applicability of Section 1312(a) with respect to its parent company, APSA. *See Storwal Int'l, Inc. v. Thom Rock Realty Co., L.P.*, 784 F. Supp. 1141, 1145 (S.D.N.Y. 1992) (rejecting the proposition that a foreign parent corporation may be deemed "doing business" in New York

through the activities of its New York subsidiary). For the foregoing reasons, Defendants' arguments that Plaintiffs' claims are barred by the door closing statute fail.

### d. Laches

Defendants assert the affirmative defense of laches. However, because this affirmative defense was not included in Defendants' Answer or other pleading, this defense has been waived. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 42 (2d Cir. 2009)(where a defendant "never affirmatively pleaded any defense *or* counterclaim ('counterdemand') in their answer or other pleading . . . . [A]ny such claim has been abandoned, at least for purposes of this action."

### G.  Defendants Counterclaims to Cancel Plaintiffs' Trademark Registrations

To prevail on a claim for cancellation of a trademark, a party "must show that (1) it has a real commercial interest in the cancellation—that is, reason to believe it will be harmed absent relief—and (2) valid grounds for cancellation exist." *Gucci*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012)(internal citations and quotations omitted). Here, although Defendants may allege harm in the absence of cancellation of Plaintiffs' marks, consistent with the foregoing analysis, it is in fact Plaintiffs who have been harmed by Defendants' infringement of their valid mark. Even assuming *arguendo*, that Defendants could show that they would be harmed absent cancellation, Defendants would not be able to find satisfactory grounds for cancellation under the Lanham Act. *See Citigroup Inc. v. City Holding Co.,* 99 CIV. 10115 (RWS), 2003 WL 282202, at *16 (S.D.N.Y. Feb. 10, 2003)(cancellation may be found where "the trademark comes within any of the specifically listed grounds in Section 14 of the Lanham Act under which a registration may be cancelled.") As noted and established above, Defendants come with none of them. Thus, Defendants' crossclaims to cancel Plaintiffs' trademarks are denied.

### H. Remedies

#### 1. Lanham Act Relief

##### a. Permanent Injunction

The Lanham Act grants federal courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C.A. § 1116. After succeeding on the merits, a plaintiff seeking a permanent injunction must establish

"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). *See also Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("The court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress). Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.') (quoting *eBay*, 547 U.S. at 391, 393–94, 126 S.Ct. 1837.). In *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, a trademark case brought under the Lanham Act, the Court concluded "...that the four-factored injunction standard articulated in *eBay* and *Salinger* applies to this action." 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) *aff'd*, 511 F. App'x 81 (2d Cir. 2013). I review those factors here, as they have been applied to trademark cases such as the one before me.

     i.  Irreparable Harm

"Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark...,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)(quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir.1985)). Irreparable harm is no longer presumed in trademark infringement actions. *See U.S. Polo Ass'n, Inc.* 800 F. Supp. 2d at 540 ("the presumption of irreparable injury in trademark cases is no longer appropriate.") However, in light of the likelihood of confusion between the Royal Oak watch and Defendants' Trimix watches, without a permanent injunction, "the reputation and goodwill cultivated by [the senior brand] would be out of its hands." *Id.* at 541. Because this harm is "neither calculable nor precisely compensable," Plaintiffs will be irreparably harmed by the ongoing likelihood of confusion. *See New York City Triathlon*, 704 F. Supp. 2d at 343.

     ii.  Remedies Available at Law

"Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries." *U.S. Polo Ass'n,* 800 F. Supp. 2d at 541 (citing *Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. v. Alberts,* 937 F.2d 77, 80 (2d Cir.1991) ("The irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights."). Thus, where as here, reputational damage has been demonstrated, remedies at law will not adequately compensate Plaintiffs for their losses.

### iii. Balance of Hardships

The equities weigh in Plaintiffs' favor. As described at length in the Findings of Fact, *supra*, Plaintiffs introduced the Royal Oak watch in 1972, have invested in advertising and promoting the mark, and Royal Oak watches constitute 75%-80% of Plaintiffs' U.S. sales. Conversely, the Trimix comprises only 1.5% of Defendants' sales. Tr. 270: 13-18. Because the Royal Oak constitutes a large portion of Plaintiffs' sales, while the Trimix constitutes a very small portion of Defendants' sales, the balance of hardships favors Plaintiffs.

### iv. Public Interest

"[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon,* 704 F. Supp. 2d at 344; *see also U.S. Polo Ass'n,* 800 F. Supp. 2d at 541("The consuming public has a protectable interest in being free from confusion, deception and mistake.") Given the likelihood of consumer confusion in this case, the public interest is served by the issuance of an injunction.

Since all factors weigh in Plaintiffs' favor, a permanent injunction will issue, enjoining future violations of Plaintiffs' trade dress rights.

### v. Additional Relief: Recall and Inventory Destruction

Plaintiffs also seek a recall of Defendants' Trimix watches from any retail platforms that may have unsold inventory. "The district court has broad discretion as to recall orders which are part of permanent injunctions." *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 97 (2d Cir. 1993). Here, although Defendant Ben-Shmuel states that Defendants have not placed any new orders for Trimix watches since this lawsuit was initiated, Defendants have continued to receive orders from their supplier and have not stopped distributing these orders to retailers. Additionally, Defendants have not provided information to the Court on the scope of a recall. However,

whatever the cost may be, Defendants are primarily to blame for incurring these costs, as they continued providing retailers with the Trimix watches after this lawsuit began. *See Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 414 (S.D.N.Y. 2011) *aff'd,* 462 F. App'x 31 (2d Cir. 2012).

This court recognizes that a recall is an "extreme remedy." *Conopco Inc. v. 3DO Co.,* 99 CV 10893 (JSM), 1999 WL 1277957, at *3 (S.D.N.Y. Dec. 7, 1999). "In deciding whether to order a recall, a court should consider the defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order." *Tecnimed,* 763 F. Supp. 2d at 414 (internal citation and quotation marks omitted). "Courts have ordered recalls where there is evidence that a defendant's infringement was intentional, including where the defendant continued infringing after receiving notice of its potentially unlawful conduct." *Id.* Here, I have found that it is more likely than not that infringement was intentional. Additionally, it is undisputed that Defendants continued receiving and distributing Trimix watches after the May 2012 cease and desist letter, and the July 2012 initiation of this litigation.

"The fact that a defendant has acted in bad faith is not sufficient, standing alone, to establish that a recall order is appropriate." *Tecnimed,* 763 F. Supp. 2d at 415. "[A] district court should carefully consider the likely burden and expense of a recall before it imposes the remedy." *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.,* 646 F.2d 800, 807 (2d Cir. 1981). "A recall is inappropriate where 'the imposition of a recall may be unduly onerous, as where the defendant's products are widely distributed and particularly expensive to ship,' or where 'the probable benefit to the plaintiff from a recall may not outweigh the burden to the defendant ... even if that burden is relatively light.'" *Tecnimed,* 763 F. Supp. 2d at 415 (quoting *Perfect Fit* 646 F.2d at 807.) Although Plaintiffs and Defendants products are not in direct competition, given Defendants' demonstrated bad faith and the likelihood of post-sale confusion, the potential injury to Plaintiffs is clear. Accordingly, the Court finds that a recall of Defendants' Trimix unsold products remaining with retailers is appropriate. While some of the considerations that go into the decision to require a recall have not been addressed by Defendants, they had the opportunity at trial and after to do so and chose not to.

Plaintiffs also request an order pursuant to 15 U.S.C. § 1118 requiring the turnover and destruction of all remaining inventory to Plaintiffs for destruction. Where the Court is entering a permanent injunction against further infringement, the destruction of goods may not be necessary. *See Fendi Adele S.R.L. v. Filene's Basement, Inc.,* 696 F. Supp. 2d 368, 392 (S.D.N.Y. 2010) ("Because, as noted, the Court is entering a permanent injunction against any further infringement by Filene's, Plaintiffs' application for an order pursuant to 15 U.S.C. § 1118 is denied.")(internal citation omitted)(citing *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.,* 589 F.Supp.2d 25, 33 (D.D.C.2008) ("[W]here an injunction is issued under the Lanham Act enjoining an infringer from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles ... may be unnecessary.") Plaintiffs have not convinced me that this additional relief is required and I see no reason why the permanent injunction will be insufficient to prevent further injury. Thus, Plaintiffs' request on this score is denied.

### b. Damages

#### i. Notice to Defendants[3]

Plaintiffs assert trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in addition to their New York state law claims. "Section 43(a) is a broad federal unfair competition provision which protects unregistered trademarks similar to the way that section 32(1) of the Lanham Act . . . protects registered marks." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 155 (2d Cir. 2002). Section 1117(a) of the Lanham Act provides identical statutory remedies for Section 32 and Section 43(a) violations: "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, [or] a violation under section 1125(a) . . . of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of section[] 1111 . . . of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Section 1111, in turn, provides three different ways that "a registrant of a mark registered in the Patent and Trademark Office" may give notice and adds that "in any suit for infringement under this chapter by such a

---

[3] The Court incorporates arguments made in briefing on Defendants' Summary Judgment motion and the parties' motions in limine.

registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration." 15 U.S.C. § 1111. Section 1117(b)-(c) provides special remedies for counterfeit marks, including the availability of treble damages and the right to elect statutory damages rather than actual damages under Section 1117(a). 15 U.S.C. § 1117.

Based on the notice requirement in Section 1111, Defendants argue that Plaintiffs are not entitled to profits related to Plaintiffs' U.S. Registration Nos. 2866069 and 3480826 prior to the cease and desist letter dated May 3, 2012, as well as all profits and damages related to U.S. Registration Nos. 4232239 and 4232240 prior to the Second Amended Complaint filed on November 20, 2012. Registration No. 2866069 was registered on July 27, 2004, and No. 3480826 was registered on August 5, 2008; Nos. 4232239 and 4332240 were both registered on October 30, 2012. Plaintiffs do not dispute that there was neither constructive nor actual notice prior to the cease and desist letter or the Second Amended Complaint, respectively. Instead, they argue that the notice requirement of Section 1111 does not affect their ability to recover under Section 1125(a), New York common law, and Section 1117(b)-(c) for counterfeit marks.

I agree with Defendants to the extent that they argue that after a mark has been registered, Section 1111 limits Plaintiffs' recovery under Section 1117(a) for both Section 32 and Section 43(a) violations. *See GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 306 (S.D.N.Y. 2002) (holding that the plaintiff may recover profits and damages for unregistered marks prior to the trademark registration, although after registration, the plaintiff must have provided notice). "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (citation and internal quotation marks omitted).

However, as Plaintiffs contend, Section 1111 cannot limit the remedies that Plaintiffs may seek under New York common law and Section 1117(b)-(c). Defendants' remaining argument that the Court may not consider Plaintiffs' ability to recover under Section 1117(b)-(c)—because Plaintiffs argue "at the eleventh hour that if they prove that the Swiss Legend Trimixes may be considered counterfeits the damage limitations provided for in 15 U.S.C. 1111 do not apply," Defs.' In Limine Reply Mem. 6—is without merit. The Second Amended Complaint specifically requests the Court, among others, to award "[t]reble damages for use of

counterfeit mark" as provided under 15 U.S.C. § 1117(b). Sec. Am. Compl. at 17 ("[t]hat Defendants be required, pursuant to 15 U.S.C. § 1117, to account to Plaintiff for any and all profits derived by it, and for all damages sustained by Plaintiff by reason of Defendants' actions complained of herein, including *an award of treble damages as provided for statute*." ) (emphasis added). Section 1111 does not foreclose Plaintiffs' remedies under New York common law and Section 1117(b)-(c).

Thus, Plaintiffs may recover under Section 1117(b)-(c). However, pursuant to 15 U.S.C. § 1117(a) only, Plaintiffs may not recover any damages or profits before May 3, 2012 for their claims based on Registration Nos. 2866069 and 3480826, or for Registration Nos. 4232239 and 4232240, in the interval between their registration on October 30, 2012, and actual notice on November 20, 2012.

ii.    Accounting of Profits

" 'In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith.' " *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 304 (S.D.N.Y. 2002)(quoting *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir.1996)). " 'While damages directly measure the plaintiff's loss, *defendant's* profits measure the defendant's gain.' " *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* 00 CV 5304(SJ), 2004 WL 896952 at *9 (E.D.N.Y. Mar. 26, 2004) (quoting *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2d Cir. 1992) (emphasis in original), *cert. denied,* 506 U.S. 991 (1992). "Profits may be awarded in cases of trademark infringement or unfair competition: (1) as a measure of plaintiff's damages; (2) if the defendant has been unjustly enriched; or (3) if necessary to deter a willful infringer from doing so again." *Id.* citing *George Basch,* 968 F.2d at 1537.

Here, an accounting is warranted because Defendants have been unjustly enriched by profit gained through infringing use. Plaintiffs are "the rightful owners of the profits secured by use of their own good will and reputation" and thus are entitled to such profits. *See Cartier,* 348 F. Supp. 2d at 253. It is more likely than not that Defendants crafted the Trimix design to make it similar to Plaintiffs' Royal Oak watch, and it is undisputed that Defendants continued to receive shipments and distribute the infringing Trimix watches subsequent to the BaselWorld incident, receipt of the cease and desist letter, and the commencement of this litigation. Given Defendant Ben-Shmuel's decades-long experience in the watch industry, his testimony that he was not

aware of any watches with similar designs to the Trimix when he designed it stretches credulity when Defendants' Trimix watch replicated almost identically the Plaintiffs' protected trade dress.

Notwithstanding the lack of notice discussed above, Plaintiffs are entitled to an accounting of profits under § 1117(b) because of Defendants' use of a counterfeit mark, discussed below. "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). "'This sequence of proof ... places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant.' " *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 304 (S.D.N.Y. 2002)(quoting *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir.1990)). Indeed, the burden is even higher with respect to overhead costs. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 290 (S.D.N.Y. 2009)(Observing that the Second Circuit "requires a 'two step procedure for deducting overhead expenses from an infringer's profits.' ")(quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 105 (2d Cir. 1999)).[4]

"The accounting period should be co-extensive with the period of infringement." *Cartier*, 348 F. Supp. 2d at 254 (citing 5 *McCarthy on Trademarks and Unfair Competition* § 30:70 (4th ed.2004)). Therefore, profits will be calculated from the inception of the Trimix on July 1, 2010 through April 30, 2013, the most recent date for which data had been provided at the time of trial. Ex. D-137. Defendants provided a summary at trial showing sales for this period of 43,322 units of Trimix watches, for a gross profit of $4,370,682. *Id.* Sergio Rodicio, the Chief Financial Officer of Defendant SWI, testified that Trimix direct product costs came to $1,991,954 and other operating expenses for Trimix watches came to $1,172,147 for this period. Tr. 282: 14-20; Ex. D-137. Direct product costs consist of average cost of watches, average cost of watch

---

[4] "The court must first 'determine what overhead expense categories ... are actually implicated by the production of the infringing product', a process that requires a determination whether there is 'a sufficient nexus ... between a category of overhead and the production or sale of the infringing product.' If such a nexus is found, the court does not then 'scrutinize for inclusion or exclusion particular items within the overhead category.' The second step is to determine 'a fair, accurate, and practical method of allocating the implicated overhead to the infringement.' The infringer has the burden of offering such a formula, which the court is to assess for reasonableness, a determination that requires a case-by-case factual assessment." *Fendi*, 642 F. Supp. 2d 276, 290 (S.D.N.Y. 2009)(quoting *Hamil,* 193 F.3d at 105, throughout).

movements, average cost of boxes, estimated shipping and estimated customs duty. Tr. 291: 16-291:1. Defendants provided a summary of the invoices from the watch supplier Solar Time, showing the 49,277 units of Trimix purchased, at a total cost of $1,265,989.5. D-81 at 15954-15967; Tr: 292-294. This comes to an average of $25.69 per watch; multiplied by the 43,322 units sold, the cost for the watches (without movements) from Solar Time is $1,112,942.18.

Other operating expenses consist of all other overhead besides taxes and amortization, excluding direct product costs already accounted for, including items such as office supplies and payroll. Tr. 302:11-303:18. However, besides asserting these costs, Defendants provided neither documentation nor analysis of how they were calculated, besides the Solar Time invoice summaries. Tr. 291-305. Without this information, Defendants have not proven direct costs under the Lanham Act, and it is not possible for the Court to conduct the two-step analysis required for overhead expenses. *See GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 304-05 (S.D.N.Y. 2002) (Calculating profits without incorporating Defendants alleged costs where "[Defendant] has failed to prove with reliable evidence any other expenses"). Here, Defendants have provided nothing beyond Mr. Rodicio's chart and the Solar Time invoice summaries. Thus, Defendants have failed to adequately show costs. Consequently, Defendants' profits from infringing sales are $3,257, 739.82. ($4,370,682 gross less the costs of Solar Time watches for $1,112,942.18.)[5]

   iii. Treble Damages and Attorneys' Fees

Plaintiffs seek to treble Defendants' profits pursuant to 15 U.S.C. § 1117(b). Section 1117 (b) provides, in relevant part:

> In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title . . . in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of
>
> **(1)** intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services;

---

[5] While some expenses may not have been deducted, this is because the records substantiating any such expense were never produced although requested as early as discovery. *See* Ex. P-66 at 4.

15 U.S.C.A. § 1117. "[T]he term 'counterfeit mark' means a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d). Since at least two of Plaintiffs' marks were registered when Defendants designed and sold their infringing merchandise, the Trimix watches are considered counterfeit under the Lanham Act. Significantly, these goods are considered counterfeit "whether or not the person against whom relief is sought knew such mark was so registered," 15 U.S.C. § 1116(d), obviating the need for "actual notice" required under § 1117(a) and § 1111. Because I already found that it is more likely than not that Defendants intentionally used Plaintiffs' marks with the knowledge that these marks were counterfeit, Plaintiffs are entitled to treble damages to reflect a total profit of $9,773,219.46 (3 x $3,257, 739.82).

Likewise, Plaintiffs are entitled to a "reasonable attorney's fee." 15 U.S.C. § 1117(b). In this circuit, "[a]ttorney's fees should be awarded pursuant to § 1117 only on evidence of fraud or bad faith." *Santana Products, Inc. v. Sylvester & Associates, Ltd.*, 279 F. App'x 42, 43 (2d Cir. 2008)(internal quotation and citation omitted). Here, as explained above, Defendants have acted in bad faith. The Court is instructed to make these awards "unless the Court finds extenuating circumstances." 15 U.S.C. § 1117(b). Defendants have presented no evidence of such circumstances. Accordingly, Plaintiffs are entitled to reasonable attorneys fees.

## CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Plaintiffs on the Lanham Act claims of trademark infringement, common law unfair competition and New York General Business Law trademark dilution.

## JUDGMENT AND FINAL INJUNCTION

For the reasons set forth in the Findings of Fact and Conclusions of Law, it is ORDERED that Plaintiffs shall have judgment against Defendants, and further that:

1.  This court has jurisdiction over the parties and the subject matter.
2.  Defendants have infringed Plaintiffs' Royal Oak trade dresses, have diluted the Royal Oak trademarks and have engaged in acts of unfair competition against Plaintiffs.
3.  Defendants are permanently enjoined from manufacturing, importing, distributing, shipping, advertising, marketing, promoting, selling or offering for sale any product

bearing Plaintiffs' Royal Oak Trade trade dress, including U.S. Trademark Registrations Nos. 2,866,069, No. 3,480,826, No. 4,232,239 and No. 4,232,240, or any trade dress similar thereto or likely to cause confusion therewith, in the sale, offering for sale, distribution or advertising of any products.

4. Defendants are further permanently enjoined from manufacturing, importing, distributing, shipping, advertising, marketing, promoting, selling or offering for sale watches beginning with SKU SL-10541 or SL-10534, or any colorable variations thereof, or any product containing a confusingly similar trade dress.

5. Defendants shall recall all remaining inventory of any Trimix watches from any costumers known or believed by Defendants to have acquired such watches for the purpose of resale on any retail platform.

6. Plaintiffs are directed to submit a proposed judgment based on the relief granted herein within ten days from the date hereof on notice to Defendants. Any counter proposed judgment will be submitted within ten days thereafter, or by January 26, 2014. Any other relief, e.g., damages after April 30, 2013 and an application for attorneys' fees, will be briefed, served and filed by February 3, 2014, and fully briefed, i.e., answering papers and reply to be served and filed with courtesy copies in chambers, on or before February 26, 2014.

**SO ORDERED.**

**Date:** 1\6\14

**New York, New York**

**HAROLD BAER, JR.**
**United States District Judge**

34